## THE CHICAGO AND ALTON RAILROAD COMPANY

*v.*

## SAMUEL P. SHANNON, Administrator, etc.

1. VERDICT — *against the evidence.* This court has repeatedly held, that unless the verdict of a jury is clearly against the evidence, it will not be disturbed. It is their province to pass upon the issues of fact, and interference will only be had to prevent a plain perversion of justice.

2. SAME — *when there is conflicting testimony.* When there is a conflict of testimony among witnesses with equal means of information, and standing equally unimpeached, and the issues have been fairly left to the jury, their verdict will not be disturbed, if the record contains evidence upon which it can be reasonably based, even though there is adverse testimony which would seem to preponderate.

3. Evidence — *concerning reputed condition of machinery.* In an action to recover damages, caused by the explosion of a certain locomotive engine, the testimony of the employees of the company using it, that, among them, such engine had always been considered unsafe, is competent, for the purpose of showing that the person having care of the machinery of the road knew, or might have known, by reasonable diligence, that it was not safe.

4. Same — *relating to theory and opinion.* Evidence, relating to mere matters of theory and opinion, though often valuable, loses its weight when the witnesses are so circumstanced, that they have a strong interest in propounding one opinion or theory, rather than another.

5. Railroad companies — *must know the condition of their machinery.* Where a certain locomotive engine was reported to the employees of the company having charge of its machinery, as unsafe, and after such report, they failed to ascertain its condition, the company cannot claim exemption by reason of such negligence on the part of its agents.

6. Same — *actual knowledge unnecessary — notice of bad condition sufficient* If a locomotive engine, in use by a company, is unsafe, actual knowledge of the fact, by the persons having charge of the machinery of the road is not necessary, in order to charge the company with the same liability as if such persons had had actual knowledge of the fact; it is sufficient if they had received such reports of its bad condition, as ought to have given them, by proper diligence, knowledge of the truth.

7. Same — *will be held to the highest degree of vigilance.* Railroad companies will be held to the highest degree of vigilance in regard to the condition of its machinery, and if the condition of an engine, in fact insecure, can be ascertained by the exercise of the highest diligence, the company will be held responsible, if it neglects to find out the fact.

8. Damages — *nominal.* Under our statute, where a person has met with death caused by the wrongful act, neglect, or default of another, whenever there are next of kin, an action will lie for the recovery of at least nominal damages.

9. Statute — *interpretation of phrase "next of kin."* The phrase "next of kin," used in the statute, is a technical, legal one, and was used by the legislature in its technical sense; meaning here what it means elsewhere. And any rule laid down by this court, fixing "next of kin" within certain degrees of consanguinity, would be purely arbitrary, and mere judicial legislation.

10. Damages — *measure of.* Under the statute, which authorizes an action to be brought for the use of the widow or next of kin, where a person has met with death, caused by the wrongful act, neglect, or default of another, the recovery, in such case, can only be for the pecuniary loss and damage suffered, and not for the bereavement.

11. Same — *must be pecuniary loss.* In such case, no matter how near the degree of relationship, unless there has been pecuniary loss, only nominal

damages can be given; but where there has been such loss, compensation must be given, no matter how remote the degree of relationship.

12. Same — *where deceased was a minor.* So, also, compensatory damages must be given, if the deceased was a minor, leaving a father entitled by law to his services.

13. Statutes — *of a State — construed by its courts.* The construction of State laws, when they do not interfere with the Constitution or laws of the United States, belongs to the State courts.

14. Damages — *measure of.* The question of how damages are to be measured, must be largely left (within the limit of the statute) to the discretion of the jury, to whom the law commits the question, and who can give such damages as they shall deem a fair and just compensation. What the life of a person is worth in a pecuniary sense to another, is a question which does not lie within the limits of exact proof, and hence the subject has been confided to the jury; the court to see, that their finding be not the result of passion or prejudice.

15. Same — *what not considered excessive.* In an action to recover damages for the death of a person, caused by the explosion of a locomotive engine, where the proof showed, that the deceased left a father fifty years old, who had little property beside his homestead; that when not on the road he had lived with him, and contributed to the support of the family; and that upon the father's life there was a policy of insurance for the benefit of the mother of deceased, upon which deceased had paid the premiums, and had promised to keep the same paid, a verdict in such case for $2,000 is not excessive damages.

16. Evidence. In this case, the deceased was a brakeman on the road, and it was held, that proof that the engineer had, on a previous trip made on the road, carried more steam than the rules of the company allowed, was inadmissible.

Appeal from the Circuit Court of McLean county; the Hon. John M. Scott, Judge, presiding.

The facts in this case are fully stated in the opinion of the Court.

Messrs. Williams & Burr, for the appellant.

Mr. W. H. Hanna, for the appellee.

Mr. Justice Lawrence delivered the opinion of the Court:

This was an action on the case brought under the statute by Samuel P. Shannon, as administrator of Joseph W. Shannon,

deceased, for the benefit of the next of kin, against the railway company, for wrongfully causing the death of the said Joseph, who was a brakeman upon said road. The plaintiff below recovered judgment for $2,000 and the defendant appealed. The death was caused by the explosion of the boiler of the locomotive while the train to which the deceased belonged was in motion, on the 18th of May, 1865. The suit is brought upon the ground, that the boiler was unsafe and was known to be so to the appellant.

It is urged by the counsel for the appellant, in a very elaborate review of the testimony, that the judgment should be reversed because the verdict was against the evidence on the main point — the insecurity of the boiler. The rule of this court has been so often announced as hardly to need repetition — that, unless the verdict is clearly against the evidence, and can be considered only as the result of passion, prejudice or a palpable misapprehension of the facts, it is not the province of the court, for that reason, to interfere. The law entrusts the trial of issues of fact to a jury, and there the court must leave it, except so far as may be necessary to interfere to prevent a plain perversion of justice. Where the record discloses a conflict of testimony among witnesses standing equally unimpeached, and with equal means of information, and the issues have been fairly left to the jury by the instructions of the court, we must necessarily say, in regard to the verdict, that it is the province of the jury to determine the weight of testimony, and if the record contains evidence upon which their finding can be fairly and reasonably based, we are not at liberty to set it aside, even though there is other and adverse testimony which, as we read it in the record, seems to us rather to preponderate. There is much truth in the remark so often made, that the credibility of conflicting witnesses can be much better determined by a jury who sees and hears them, than by an appellate court which merely reads their testimony as embodied in a bill of exceptions.

As to the main question in the present case, it is undeniable, that the evidence is of that conflicting character, upon which it is the peculiar province of a jury to decide. Hugh McGee

testified, that he had been a boiler maker thirteen years; that he worked in the machine shops of the defendant during the summer of 1864; that while there he worked on the engine in question, and put some stay-bolts in the side of the fire-box; that it was not braced as he would like to see a first class engine braced, and that after the explosion he examined it, and found a crack, apparently an old crack, running from the edge of the sheet that had burst.  He further says, that he called the attention of the master mechanic, and the foreman boiler maker to the crack, and they examined it.  They, however, when called by the defendant, swore that they never made an examination of the boiler with McGee, and that, although they carefully examined it, they found no old crack.

The plaintiff also read the deposition of John W. Johnson, who testified, that he had been a boiler maker over thirty years, and was foreman in the boiler shop of the defendant at Bloomington.  This locomotive was repaired while he was in the shop in 1864, and was about finished when he left.  The stay bolts inside the boiler were very weak, and he took them out and put in as many new copper ones as they would allow him, and put in a number of extra ones where none had been before. He considered the boiler very weak, and the copper of the firebox too light.  Did not consider it safe, and cautioned one of the men that saw it about the boiler's weakness, and told the master mechanic of its weakness.  He says, he does not think the boiler was safe for the business it had to do.  We understand this witness as referring to the condition of the boiler after it was repaired as well as before.

Edward Stone, also called by plaintiff, had been a boiler-maker for thirty years, had worked on the boiler in question; the side sheets of the fire-box were bulged in three inches; the stay bolts were seven or eight inches apart in some places, and should not have been more than three, or four, or five.  He put in new stay bolts where it was bulged.  The boiler came upon the road in August or September, 1863, and the repairs referred to by this witness were made three or four months after that time.  He says he saw the boiler after the explosion, and does

not think it was properly braced in the crown-sheet. Did not consider the boiler safe.

Besides these boiler makers, the plaintiff called several locomotive engineers connected with the road, and several machinists who worked in the shops, and proved by them, that this engine had had a bad reputation from the time it came upon the road, and that it was not considered safe. This evidence of reputation was admitted, and properly, for the purpose of showing that the persons having charge of the machinery of the road knew, or ought to have known by reasonable diligence, that this locomotive was not safe. It was also found that the boiler, when in use, emitted a peculiar cracking or snapping sound, which was unusual, and was made a subject of remark among the engineers, one of whom swears he did not think the boiler safe, and did not like to run this engine, and he several times reported it to the foreman of the round-house.

The defendant called the master mechanic, the foreman of the round-house, the foreman of the boiler shop, and the foreman of the blacksmith shop. The deposition of one of the firm in Philadelphia, that manufactured the engine, was also taken. All these witnesses testify minutely and positively as to the construction and condition of the boiler, swearing that it was made of the best materials, and in the best manner, and had been put in thorough repair, and that the boiler and engine were of the first quality. Two of these witnesses also swear, that from certain indications about the boiler after the explosion, they were of opinion that the cause of the explosion was the carelessness of the engineer, in allowing the water to get too low in the boiler. All persons who have had much experience in jury trials must have noticed how apt are witnesses, called as experts, to speak with great confidence, when seeking to ascertain the unknown cause of certain effects, by appearances which, to others, convey little meaning. Such evidence is often valuable, but as it relates to matters of theory and opinion merely, it is entitled to less weight when the witnesses are so circumstanced that they have a strong interest in propounding one opinion or theory rather than another. In the present

case, conceding the witnesses on both sides to be equally honest, it was not improper for the jury to consider that those for the defendant would naturally be inclined to adopt a theory of the explosion, which would relieve them from the charge of having been remiss in looking to the safety of the boiler.

We have not, however, stated this evidence for the purpose of showing that the jury could have rendered no other verdict. On the contrary, the witnesses for the defendant testify with so much minuteness and intelligence as to leave us in great doubt whether this boiler was unsafe or not, and it is precisely because the evidence is conflicting and does leave this question in doubt that it would not be proper for us to set aside the verdict on the ground that it is clearly against the evidence. The testimony of the plaintiff's witnesses as to the insecurity of the boiler, it must be admitted, receives some support from the fact, that the boiler did finally explode, killing not only the brakeman, for whose death this suit is brought, but the engineer. The explosion resulted either from the inherent weakness of the boiler, or from the carelessness of the engineer. Amid this conflicting evidence the jury would naturally regard the explosion as more likely to have been produced by the former cause, than by a degree of carelessness on the part of the engineer which would be attended with the most deadly peril to his own life.

As to the other question upon the evidence, the knowledge of the company's agents that the boiler was not considered safe, little need be said. It is not only proved, that the engine had a bad reputation among the employees, but Lighthall, a locomotive engineer, who had run the engine, testifies that he reported it several times to the foreman of the round-house and the superintendent of machinery, as unsafe. If, after receiving these reports, they did not inform themselves as to the condition of the engine, they ought to have done so, and can claim no exemption by reason of their negligence.

It is also insisted that the court erred in refusing the following instructions:

" Unless the evidence for the plaintiff preponderates over that of the defendant as to the fact of the engine being unsafe, and that the defendant's employees, whose duty it was to know it, did know it, they will find for the defendant.

" Even if the jury should believe from the evidence that the engine was unsafe, and that the defendant's employees, whose duty it was to know it, did know that it was unsafe, yet if they further believe from the evidence that the plaintiff's intestate was over twenty-one years of age and that he was in no way indebted to the plaintiff or any one else, and that the deceased left no widow or children nor descendants in any degree, then there was no one who had any legal interest in his life and the plaintiff cannot recover in this case."

The first of the foregoing instructions was properly refused. Even if the employees of the company did not positively *know* that the engine was unsafe, yet, if it was in fact unsafe, and they had received such reports in regard to it as ought to have put them on their guard, and to have led, by the use of proper diligence, to a knowledge of the facts, the company must be held to the same liability as if their agents had actual knowledge. It is not enough to say, that a railway company has no right to use engines known to be unsafe. It must be held to the highest degree of vigilance in this regard, and if the condition of a locomotive, in fact insecure, can be ascertained by the exercise of the highest diligence, the company must be responsible if it neglects to ascertain the truth.

The question presented in the second of the foregoing instructions is one of some novelty. The statute upon this subject, 2 Purples' Statutes, 1245, Scates' Comp. 422, authorizes the suit to be brought for the exclusive use of the widow and next of kin. We do not perceive how the conclusion is to be avoided, that wherever there are next of kin the action will lie for the recovery of at least nominal damages. We know of no principle by which we are authorized to say that " the next of kin " must be within certain degrees of consanguinity. Any rule or limitation of that character which we should

endeavor to lay down, would be purely arbitrary, and mere judicial legislation. The phrase "next of kin," used in the statute, is a technical legal phrase, and we must suppose it to have been used by the legislature in its technical sense. It means here what it means elsewhere.

But, while the action may be brought in any case where there are next of kin, the more important question remains — what is to be the measure of damages? This court held in *The City of Chicago* v. *Major*, 18 Ill. 349, and again in *The Chicago and Rock Island Railroad Company* v. *Morris*, 26 Ill. 400, that the recovery can only be for the pecuniary loss and damage, and not for the bereavement. Nothing can be given as *solatium*. If then the next of kin are collateral kindred of the deceased, and have not been receiving from him pecuniary assistance, and are not in a situation to require it, it is immaterial how near the degree of relationship may be, only nominal damages can be given, because there has been no pecuniary injury. If, on the other hand, the next of kin have been dependent on the deceased for support, in whole or in part, it is immaterial how remote the relationship may be, there has been a pecuniary loss for which compensation under the statute must be given. So, also, if the deceased was a minor and leaves a father entitled, by law, to his services.

It is said, on the authority of an unofficial report, that the Supreme Court of the United States have recently held, in a suit brought by the executors of Barron against the Illinois Central Railroad company, and taken to that court by a writ of error to the federal court of this district, that a suit cannot be brought under this statute for the benefit of the parents, brothers and sisters of the deceased, who was of age, alleging, as a reason, that they have no pecuniary interest in his life. While we entertain great respect for that court, we cannot agree with it in this view, if it has so held; and the construction of State laws, when they do not interfere with the Constitution or laws of the United States, belongs to the State courts.

We hold, then, that such next of kin as have suffered

pecuniary injury from the death of deceased, may recover pecuniary compensatory damages under this statute. How this pecuniary damage is to be measured, — in other words, what is to be the amount of the verdict, must be largely left (within the limits of the statute) to the discretion of the jury. The legislature has used language which seems to recognize this difficulty of exact measurement, and commits the question especially to the finding of the jury. The law provides, that "they are to give such damages as they shall deem a fair and just compensation." What the life of one person is worth, in a pecuniary sense, to another, is a question incapable, from its nature, of exact determination. Although the wealth or poverty of the deceased may be important elements, they are not the only ones that enter into the problem. If the deceased was poor, the loss may consist in the fact, that his personal exertions can no longer support those dependent upon him. If rich, the loss may be nearly as great, in the deprivation of the care and management of his business or estate. In creating this right of action the legislature have confided to the jury a subject, that does not lie within the limits of exact proof. But, in this, as in all other actions, the court must so far supervise the verdict as to see that it is not the result of unreasoning prejudice or passion.

In the case at bar it is in proof, that the father of the deceased was fifty years old, and had little property besides his homestead ; that the deceased lived at his father's when not on the road, and contributed to the support of the family, and that his father had an insurance policy on his (the father's) life, for the benefit of the mother of deceased, the premium upon which, $118, the deceased had paid, and promised to keep paid. The verdict was for $2,000, and we do not feel authorized to say it was too large.

The evidence offered by the defendant, that the engineer, on a previous trip, had carried more steam than the rules of the company allow, was properly excluded. It could shed no light on the issues in this case.

*Judgment affirmed.*

BREESE, J., dissents, on the ground, that, in his opinion, the weight of evidence greatly preponderates in favor of the safety and sufficiency of the engine, and on the further ground that the damages are excessive.