[Filed June 21, 1892.]

## CHARLES H. FISHER v. OREGON SHORT LINE, ETC. RY. CO.

EVIDENCE—EXPERT TESTIMONY—HARMLESS ERROR.—When the matter under consideration before a jury is of that character about which any one of ordinary intelligence, without any peculiar habits or course of study, is able to form a correct opinion, expert testimony as to such matter is inadmissible; but when, upon the whole case, it is manifest that if such testimony had not been introduced, the jury could not have reached a different conclusion from that expressed in the opinions of the experts, the admission of such evidence will be regarded as a harmless error.

MASTER AND SERVANT—VICE-PRINCIPAL—FELLOW-SERVANT—NEGLIGENCE.—An employe engaged in the performance of some duty which the master owes to the servant,—such as that of a railroad company to furnish a reasonably safe track and roadbed whereon its trainmen may operate its cars,—is a vice-principal as distinguished from a fellow-servant; and his negligence causing injury to such servant will render the master liable.

PRACTICE IN SUPREME COURT—APPEALS—BILL OF EXCEPTIONS.—The practice of incorporating in a bill of exceptions all the testimony taken in the court below, whether pertinent to the exceptions or not, is condemned as being contrary to the statute defining what a bill of exceptions should contain.

Union county: J. A. FEE, Judge.

Defendant appeals.  Affirmed.

*W. W. Cotton,* and *Zera Snow,* for Appellant.

*J. H. Slater & Sons, R. & E. B. Williams & Carey,* for Respondent.

LORD, J.—This is an action to recover damages for personal injuries alleged to have been caused by the negligence of the defendant in suffering its railroad track to be obstructed by a slide of snow, earth, and gravel, at a point named on its road, whereby the train, of which plaintiff was conductor, and upon which he was riding, was thrown from the track, and he was injured. The defense set up is contributory negligence; and as relevant to the matter under review, the defendant' alleged that its track had been obstructed for one or two days prior to the accident; that the plaintiff and other men with him went out on a work train for the express purpose of removing slides of snow and earth which had accumulated on the track, so that trains might pass over it; that the plaintiff had full knowledge of the obstructed condition of the track; that at the time of his injury, the plaintiff was in charge of the train, which was being run by the engineers at a dangerous rate of speed, and without keeping a good lookout ahead of said train, in consequence of which the train struck a slide of snow and earth, and was thrown from the track.

Under this defense, the defendant claimed, and sought to establish—first, that the plaintiff assumed as part of his contract of employment the risk of the train striking such an obstruction on the railroad track as that out of which his injury arose; and, second, that the plaintiff's injury was the result of his own negligence in allowing the engineer to run the train at an excessive or dangerous rate of speed without keeping any lookout for obstructions on the track.

The evidence shows that prior to the day of the accident, a good deal of snow had fallen, which the wind, in some places, blew into drifts. Orders had been given that regular trains would not be run. The plaintiff was employed as a conductor of a freight train. On the day of his injury, he received an order from the trainmaster as follows: " To engineers 83 and 86 (engines 83 and 86 coupled)—Con-

ductor Fisher will run extra from Kamela to La Grande."
Soon after this order was received, the two engines named
were coupled to a caboose and started from Kamela to
La Grande. Hooker was the engineer of 83, the forward
engine, and upon it the plaintiff rode. In the caboose was
the roadmaster with several shovelers. When near a place
called Stumptown, some fourteen miles from Kamela, the
train ran into a slide of snow and gravel, and engine 83 was
thrown from the track into the Grande Ronde river. Both
the plaintiff and Hooker, the engineer, went down with it
into the river, and the plaintiff was so injured that subse-
quently his leg had to be amputated. At the point where
the accident occurred, the roadbed is cut into the side of a
hill, and the road forms a curve, so that the place where
the slide obstructed the track could be seen some two or
three hundred yards, but not so definitely as to determine
whether it was a slide or a drift. The snow-plow had been
through on the track the day before, and the plaintiff and
engineer had a right to suppose that the track was free
from obstructions. There were several light drifts of snow
blown on the track at places, but they were not very deep,
and were of light, soft snow. The engine was not equipped
with a regular snow-plow, but it had a sheet-iron protection
on the pilot to clear the drifts of snow from the track. The
day was fair and bright. When the engine would run into
these snow drifts, the engineer would shut the cab windows,
as it would cause the snow to fly in all directions, and cover
the windows so as to obstruct the view for a moment; but
as soon as the drift was passed, the side window would be
opened, from which a lookout could be kept. The window
was open when the engine passed the section men at the
crossing. It was closed in passing a snow drift just before
the engine struck the slide; but owing to the curvature of
the road, if the window had been open at the time, it is
doubtful if the result would have been different, as it was
not possible for them to distinguish that it was a slide until

the engine got close to it.   Carleston testified that he and
Chamberlain saw this slide, and reported it to the section
foreman on the evening before; that when he saw it, he
could see that it was a slide and not a drift; that the rest
of the track was good, and that he did not find anything
on the track except the slide.   Chamberlain testified that he
too saw it the evening before; that he could see where two
or three slides had come from two or three hundred feet up
the mountain, and could see that they had made a slide
across the track, and not a drift of snow, and that he reported
it that evening at Hilgard to the section foreman.

There is a difference between a slide and a drift; and
the testimony of these two witnesses, as well as others,
seems to take it for granted that a slide is dangerous.
Slides come from the sides of the mountains, and are
usually mingled snow and gravel and rock, and neces-
sarily a dangerous obstruction on a track.   These two
witnesses had been sent out by the section foreman Lee
as track walkers, to examine the track;— to go over it and
see what condition it was in, and to report the condition
of the track to him.   This they did; yet this section fore-
man, with this knowledge of the condition of the track,
utterly neglected to investigate the matter himself, or to
give warning of the condition of the track at the place of
this slide.   The foreman was at a telegraph station, but
not even a message was sent to the roadmaster or train
dispatcher.   Neither the plaintiff nor the engineer knew
of the location of the slide.   The blockade was east of that
point; and when they received orders to run extra to La
Grande, they had reason, on this account, to rely on a safe
track, as well as to suppose that the road was open and in
running order from the fact that the snow-plow had gone
over the track to La Grande the day previous.   Madden,
the roadmaster, whose duty included superintending sec-
tion men and keeping obstructions from the track, testified
that he had no reason to anticipate that any slide would

be encountered at that point. Nor is this all. When the
train passed the foreman on the road at a crossing only a
short distance from the place where it struck the slide and
fell over into the river, he neither gave those in charge of
it any warning nor put up any signals to warn them of
the danger. The testimony indicates that at the time the
engine struck the slide, it was being run at the rate of
fourteen or fifteen miles an hour. Hooker, the engineer,
testified that the engine was running at the rate of fifteen
miles an hour when it struck the slide; that he had been
an engineer seventeen years. Then he was asked: "Is
that the fastest rate of speed?" Answer—"No, sir; it is
not." Question—"How fast can an engine be safely oper-
ated on a track in the condition that was in between
Kamela and the place where the accident occurred?"
Defendant objected, and the objection was overruled.
A.—"Twenty miles an hour." Q.—"What was the con-
dition of the track up to that point as you found it in
making that run?" A.—"Very good so far as the track
was concerned; I could not say anything about it; there
was some snow on the track." Q.—"Did you meet with
any obstructions or slides?" A.—"No, sir; not to amount
to anything; there were no slides of any kind; there were
some little drifts of snow across the track." A like objec-
tion was raised to the testimony of the plaintiff when
recalled, as follows: Q.—"From your experience as a rail-
road man, and your knowledge of the railroad track as it
existed between Kamela and the place of accident, state
whether or not the rate of fifteen miles an hour is a danger-
ous rate of speed?" (Objected to and overruled.) A.—"No;
I would not consider it so." Q.—"How fast can a train,
such as this was and under the circumstances under which
this train was running there at that place, run with safety,
in your opinion?" (Same objection.) A.—"A train might
run with perfect safety along that point of track anywhere
from twenty to twenty-five miles an hour."

The objection to this testimony is, that the opinions of Hooker and Fisher were not necessary to aid the jury in determining whether the rate of speed was safe; that the question presented by the case was not one requiring any expert knowledge.    The general rule undoubtedly is, that witnesses must ordinarily state facts, and not give their opinions.    Our code provides that on the trial evidence may be given of the opinion of a witness on a question of science, art, or trade, when he is skilled therein.   (Hill's Code, § 706.)    When the matter under consideration is of that character that any one of ordinary intelligence, without any peculiar habits or course of study, is able to form a correct opinion, it is manifest that the opinion of an expert as evidence is inadmissible.    In such case, his opinion could not operate to aid the jury, but would only serve to anticipate and usurp their duty; nor will it render such opinions admissible as evidence because the witness may be able to reason more logically, or to form a better opinion than the jury.    Mr. Rogers says:   "The testimony of experts is inadmissible upon a matter concerning which, with the same knowledge of facts, the opinion of any one else would have as much weight.    It is only admissible when the facts to be determined are obscure, and can only be made clear by and through the opinions of persons skilled in relation to the subject matter of inquiry."   (Rogers, Expert Testimony, 14.)

When the nature of a question is such that a man of ordinary intelligence and experience is incapable of drawing correct conclusions from the facts in evidence without the assistance of some one who has special skill or knowledge on the subject, the opinion of an expert is desirable and competent evidence.    Chief Justice SHAW said:    "It is not because a man has a reputation of superior sagacity and judgment and power of reasoning, that his testimony is admissible; if so, such men might be called in all cases and advise the jury, and it would change the mode of trial;

but it is because a man's professional pursuits require peculiar skill and knowledge in some department of science not common to men in general, which enables him to draw an inference, when men of common experience, after all the facts proved, would be left in the dark." (*N. E. Glass Co.* v. *Lovell,* 7 Cush. 319.) It was said by the court, in *Taylor* v. *Monroe,* 43 Conn. 44, that "the test of the admissibility of expert testimony is not whether the subject matter is common or uncommon, or whether many or few have knowledge of it, but whether the witnesses offered have any peculiar knowledge or experience not common to the world, which render their opinions founded thereon an aid to the triers." The rule is laid down, and illustrated by cases by Mr. Lawson, that "mechanics, artisans, and workmen are experts as to matters of technical skill in their trades, and their opinions in such cases are admissible." And as corrollaries or sub-rules, he further states that "nautical men are experts on the question of care in marine cases"; and "railroad men are experts as to railroad management." (Lawson, Exp. Op. Ev. 70.) The competency of the evidence objected to is sought to be upheld upon the ground that no particular rate of speed can be assumed to be dangerous without proof; that the jurors were not experienced railroad men, and could do no more than guess whether it was safe or not to run the train as was done under the circumstances, and that the required proof could only be offered by the testimony of those whose experience and observation have given them a particular knowledge upon the subject. There may be no doubt that the conductor and engineer based their statements or testimony upon their observation and experience as railroad men. Under the circumstances, it was their opinion, in the light of their experience and knowledge as railroad men in the operation of trains, that the rate of speed at which the train was running was not excessive or dangerous; that its rate of speed, under existing conditions, might have been increased

with safety; but it is where matters of technical skill or scientific knowledge are involved, that the opinions of mechanics and artisans are admissible. While it is true that what is or is not dangerous, is sometimes a question that can only be properly answered by experts, as some of the cases indicate (*Cross* v. *Ry. Co.* 69 Mich. 363; 13 Am. St. Rep. 399; *Chicago etc. R. R. Co.* v. *Gregory,* 58 Ill. 272; *Huizega* v. *Cutler etc. Co.* 51 Mich. 272; *R. R. Co.* v. *Shannon,* 43 Ill. 338; *Bridger* v. *R. R. Co.* 25 S. C. 24); yet they are not cases like the present.

The opinion asked here goes to the merits. It seems to us, upon the facts as disclosed by the record, the jury was competent to form an opinion, or draw the proper conclusion from the facts, without the opinion of the witnesses upon the subject. It is not material that the evidence would not justify that construction put upon it by the defendant, or that the witnesses understood it differently, as its competency depends upon a state of facts involving technical skill, or knowledge, which the facts in question did not present for consideration. The defendant contended that, under the conditions presented by the evidence, the running of the train at the rate of fifteen miles an hour, without keeping any lookout, was dangerous, and negligence in the plaintiff contributing to his injury. While the witnesses expressed the opinion, that under the circumstances the rate of speed was not excessive or dangerous, and that it might have been increased without liability to accident, yet the opinion being such as touched the merits, and upon a subject matter that involved no technical skill or knowledge, and which the jury was competent to decide, we think the opinions of these witnesses as evidence was inadmissible, and that it would have been more consonant with the rules of evidence to reject it. But the question arises, whether upon the facts the jury could have formed any other opinion, or reached any different conclusion from that expressed by these witnesses, for, if they could not,

the error could affect no substantial right of the defendant, and was not reversible error.

The contention of the defendant was, that the evidence tended to establish the defense pleaded,—that the plaintiff was employed upon a work train, and went out with it upon a track known to be obstructed for the purpose of removing such obstruction; that with such knowledge and upon a road thus obstructed, he permitted the train to be run at an excessive rate of speed, without keeping any lookout, and when the snow was plastered over the windows so that neither he nor the engineer could see ahead; that under these circumstances, and in violation of the rules of the defendant as to the rate of speed to be used in such case, and in violation of their duty, they recklessly ran the train into the slide and caused the accident. If this were a proper construction of the facts, or if upon any such state of facts the opinion of these witnesses had been based, we should feel no hesitation in declaring such evidence not only inadmissible, but such error as would entitle the appellant to a new trial.

The telegraphic order received by the plaintiff was not to work, but to run extra,—that is to say, that the orders which he and the engineers received show that they were led to believe that they had a clear track from Kamela to La Grande as an extra, and not that they were to work between those points. If those in charge of the train had been instructed to clear the track of obstructions, or do other work on their way to La Grande, their orders would have been in an entirely different form, as the rules, which are made a part of the so called bill of exceptions, disclose. A rotary snow-plow had gone through over the track the day before to La Grande, and the roadmaster and other officers supposed and thought the road was open to La Grande from Kamela, where Fisher and his train were, and where the roadmaster was with a gang of shovellers in a caboose. It was between La Grande and Huntington

that the road was blockaded; and the rotary plow in clearing it, broke, so that the roadmaster, Madden, was telegraphed for from La Grande to bring his shovellers to that place. Fisher, as conductor, and the engineers then received from the train dispatcher their running orders to La Grande, in the course of which journey the accident occurred, as already detailed.

It is plain from the telegraphic correspondence between the roadmaster and the train dispatcher that there was no blockade or obstruction thought of between Kamela and La Grande; and in view of the other facts already stated the plaintiff had no reason to suppose that he was on a working train for the purpose of aiding in removing obstructions from the track, or that the track was obstructed, or that he was performing any other than his customary duty as freight conductor in the run from Kamela toward La Grande. Nor was the train run without any lookout, or the cab windows so covered with snow, or kept closed that they could not see out. It was only when passing through the drifts of snow that the windows were closed, and then only for an instant, as has been already sufficiently explained. The track was not out of order, or in any condition of obstruction except at the slide, which had been reported by the track walkers to the section foreman. The track walkers did not report the drifts of snow between the slide and Hilgard, for they did not consider them of sufficient importance; but they did report the slide as coming from the mountain, showing that they did consider it as something that merited more than ordinary consideration, and the foreman must have so understood it. Nor until the engine struck the slide, did they meet with any obstruction upon the track in the run, showing again that the track walkers had reported truly the only obstruction on the track which required to be attended to before a train should be started without notifying its officers of its location. Under these conditions and circumstances, there is

no rule of the defendant company that the running of a
train at the rate of fifteen miles an hour is excessive or
reckless; on the contrary, it and even a greater rate of
speed are permissible.   Madden, the roadmaster, the only
one of the defendant's witnesses upon the train, or who
knew anything about it, expressly says that under the cir-
cumstances he did not consider it dangerous to run at the
rate of speed at which the train was going; that he had no
reason to expect that the train would run into a slide, or
that there was such an obstruction upon the track; that
he did not usually interfere in any way, as he calculated
the men running the train had common sense, but that he
would have interfered if he had thought there was any
need of it.   So that, in view of the whole record, the opinion
expressed, that the rate of speed at which the train was
running when it struck the slide was not excessive or
dangerous, is correct, and beyond dispute upon the facts,
and only such a conclusion as the jury must have drawn
from the facts.   So far as the verdict is concerned, then, it
could not have been different if the expert evidence had
not been admitted.

There is but one other point we deem it necessary to
consider.   It is in relation to an instruction given, which,
it is claimed, assumes without qualification that track men
and the plaintiff were not fellow-servants; that trainmen
and section men may be, and frequently are, fellow-servants,
is not disputed, and no authorities need to be cited.

In *Wellman* v. *Oregon Short Line, etc. Ry. Co.* 21 Or. 530,
which involved substantially the same pleadings and issues,
—Wellman being on the same train as fireman, and killed
by the same accident,—it was said by this court:   "To
avoid misconception, a single observation in relation to
instruction number seven seems to be necessary.   It is as
to the effect to be given to the knowledge acquired by the
trackmen or section master on the fifteenth of January,
the day before the accident.   There is evidence tending to

show that on that day these persons saw the slide that caused the injury, and communicated the fact to the section foreman the same evening.   If such was the fact, he was bound to communicate the information to those in charge of the train which was to pass over the road, and the failure to do so would subject the defendant to liability independent of anything that has already been said."   This was based on the theory that section men are vice-principals when engaged in the performance of some duty which the master owes to the servant, or is bound to perform.   It is sought to avoid the effect of such conclusion in the present case by claiming that the evidence shows that, at the time of his injury, the plaintiff was employed on a work train that went out for the express purpose of removing obstructions upon the track between Kamela and La Grande; that he took charge of such train with full knowledge that the road was obstructed or blockaded, for the purpose of finding, and to aid in removing, such obstructions; and hence, the defendant claims that it was not his duty to notify or inform the plaintiff that the track was obstructed, nor to remove any obstruction upon the track before the plaintiff's train should reach them, as this was the identical work that he was going out to do.   Upon this assumption of the facts, the defendant claims that liability to injury from obstructions upon the track was incident to the plaintiff's contract of employment, and a risk he voluntarily assumed.   In support of this contention, it cites and relies upon the case of *Carlson* v. *Oregon Short Line, etc. Ry. Co.* 21 Or. 454.   That case has no application to the facts involved in the present case.   There, it was held that a servant engaged in repairing a railroad track, already known to him to be in a dilapidated condition, assumes as part of his contract of employment the risks incident thereto, among which is the dilapidated condition of the track; but the court expressly declared that the servant does not assume the increased risk arising from neglect of

the railway company — unknown to him, or not ascertainable by ordinary diligence — to use proper care to learn the condition of the track, and to prevent accident to its servants.  BEAN, J., says:  "The fact that the track was known to be in a dilapidated condition, and out of repair, did not relieve the master from the discharge of his duty in the premises.  The deceased could still exact from it the exercise of such care and vigilance, and require it to take such precautionary measures to prevent accidents as the exigencies of the case, having due regard to the safety of its servants, would suggest to prudent and cautious men, experienced in that particular branch of business."

Within the principle declared in that case, it would hardly seem doubtful, if the facts be assumed to exist, as claimed by the defendant, that the plaintiff was going out in charge of a train to find and remove obstructions upon the track between Kamela and La Grande, that the master in the exercise of ordinary care would not have been bound to notify the plaintiff of the existence and location of this slide obstructing its track.  The section foreman, whose business it was to inspect the track, and keep proper watch and oversight over it, had, in the performance of that duty of the master delegated to him, sent out two track walkers the night before the accident to ascertain the condition of the track, and they reported to him that there was a slide obstructing the track.  The section foreman knew, therefore, of the existence and location of the slide the evening before the train started, and had the means by telegraph to communicate that important fact to the train-dispatcher, or he could himself have notified the plaintiff, or warned him in various ways, and thus avoided any liability to accident on account of such slide.  As the foreman stands for the master in such case, it would seem to be a plain dictate of duty for the master, with due regard for the safety of its servants, and in the exercise of that care and vigilance which the exigency of the situation required, to have noti-

fied the plaintiff of the existence and location of the slide, and thereby avoided liability to accident. If the exercise of ordinary care required the master to take some such precautionary measures to prevent such an accident to its servants, the plaintiff did not assume the risk of such slide. As BEAN, J., said in *Carlson* v. *Oregon Short Line, etc. Ry. Co. supra,* in speaking of the risks of the servant: "But if it were increased by the neglect of the master to use proper care before the storm to keep the bridge in repair, or to ascertain the condition of the track or bridge after the storm, or to take such due and proper precautionary measures to prevent accident to its employés, as the exigency of the situation might require, he did not assume such risks."

But we are not compelled to rely upon this aspect of the case; it is only suggested to show its character, and the difficulty of giving it any solution consistent with the exercise of due care in the premises. The case here is wholly different upon its facts. As they have already been detailed, it is unnecessary to repeat them; but it will be enough to summarize some of them to show the inapplicability of the theory of the defence to them. The plaintiff was not on a work train sent out to clear obstructions from the track between Kamela and La Grande. Nor did he take charge of the train with any notice or knowledge that his duties involved such work, or other than his customary duty in running the train between Kamela and La Grande. For various reasons, he had a right to suppose that the track was clear or free from obstructions, except light snow blown into drifts, and that the blockaded track was between Huntington and La Grande. The shovelers were being carried to La Grande. The roadmaster in charge of them says he had no reason to expect that they would run into a slide, or that they were running at a dangerous rate of speed. Upon this state of facts, the risks incident to a track known to be obstructed with slides of snow and earth, as constituting a part of the contract of one accepting service upon

it, can have no application.   In accepting his employment, and running the train between Kamela and La Grande, the plaintiff did not assume, as a part of his contract, the risks arising from a track obstructed with slides of snow and earth.   Nor did the plaintiff know that the track was obstructed by a slide, but the defendant, through its foreman, knew of its existence and location.   But to avoid the effect of this, it is said that the track walkers did not report it as dangerous; hence, it is argued that the foreman had no knowledge that any obstructions dangerous to the passage of trains were to be found upon the track any where along his section.   But they did report it as a slide coming from the mountain; and the difference between a slide and a drift has been sufficiently adverted to as showing the danger of the former when it obstructs the track.   They did not report the snow drifts across the track, but they did the slide that had come down the mountain and obstructed the track; and as indicating that they understood the difference, and the duty of the foreman, when the slide was reported, to give notice of its existence and location, at least, the result verified; the train experienced no difficulty in running through the snow drifts, but went to destruction when it encountered the slide.   It was clearly the duty of the foreman to have communicated to those in charge of the train the information he received of the existence of this slide obstructing the track, and the failure to do so was negligence for which the defendant is liable.   We do not deem it necessary to pursue the record further.   We have examined it fully and carefully, and we do not think, upon the entire record, that any substantial right of the defendant has been ignored or prejudiced; and though there may have been a mere technical error in the admission of the expert evidence, yet it is not possible to see upon this record how the verdict could have been different if such evidence had not been admitted.

The bill of exceptions, so called, in this case, contains the entire evidence, oral and documentary, all the instructions pro and con, and in fact is a transcript of the whole proceedings as extended from the short-hand report of the trial. Necessarily such a bill of exceptions is filled with much surperfluous and irrelevant matter, imposing needless expense on the parties and much increased labor upon us. As the judgment was large, we have felt bound to examine the evidence carefully, so as to ascertain the facts involved upon which error is predicted, and then apply the law. This we have done with the above result, in the hope that hereafter the bill of exceptions will contain no matter not essential to explain the exceptions.

The judgment is affirmed.