Argued October 12, 1916, reargued February 8, affirmed February 27, rehearing denied March 27, 1917.

## STATE *v.* MORRIS.

(163 Pac. 567.)

**Indictment and Information—"Murder in Second Degree"—Sufficiency —Homicide.**

1. The indictment charged that defendant and another, then and there acting together, and unlawfully and feloniously engaged in committing a felony, to wit, the crime of larceny in a dwelling-house, by then and there unlawfully and feloniously stealing and carrying away currency of the value of $105, and while engaged in the commission of such felony, unlawfully and feloniously assaulted deceased by choking and strangling her, whereof she died. Section 1894, L. O. L., provides that if any person shall purposely and maliciously, but without deliberation and premeditation, or in the commission, or attempt to commit, any felony other than arson, etc., kill another, such person shall be guilty of "murder in the second degree." The indictment substantially followed forms Nos. 4 and 12, pages 1010, 1012, L. O. L. *Held,* that as an indictment which sets forth the acts constituting the crime clearly and distinctly, in ordinary and concise language, and in such a manner as to enable a person of common understanding to know what is intended thereby, is sufficient under Sections 1437–1439, the indictment is not defective under Sections 1435–1460, in which

said sections are found, because failing to directly allege that defendants took, stole or carried away money; it being plainly charged that the killing was done while defendants were feloniously stealing money in a dwelling-house.    .    .

[As to form and sufficiency of indictment for murder, see note in 3 Am. St. Rep. 279.]

### Criminal Law—Harmless Error—Examination of Jurors.

2.   Where after all of the regular panel of jurors except one venireman had been examined and excused and before any juror had been accepted, the prosecutor asked the remaining venireman an improper question and he was excused, the asking of such question was not reversible error, it not appearing that defendant's rights were prejudiced, for he might thereafter examine any juror as to whether he had heard anything about the occurrence.

### Criminal Law—Appeal—Improper Conduct of Counsel.

3.   A mere exception to an improper remark by the prosecutor in examining venireman will not be considered on appeal, where the venireman was not challenged and no ruling on such remark was demanded.

### Criminal Law—Confessions—Admission.

4.   A confession, unless voluntary and not induced by hope or fear, is not admissible; Section 1537, L. O. L., expressly excluding confessions induced by fear or threats.

### Criminal Law—Appeal—Review.

5.   The determination of the trial court that a confession of defendant was obtained without the influence of hope or fear exercised by a third person will not be disturbed on review, unless there is clear and manifest error.

### Criminal Law—Confessions—Admission.

6.   Where accused was fully informed of the nature of the charge against him and was advised to consult his people or an attorney before making any statement, being warned that any statement he made would be used against him, his confession, made as a result of the examination of the prosecutor and sheriff, which examination was conducted in an ordinary manner, without any threats being made or inducements offered, is voluntary and admissible in evidence; the fact that the sheriff after the confession told accused he would do what he could for him not affecting it.

### Criminal Law—Confessions—Admissibility in Evidence.

7.   That a confession is made in answer to questions, assuming the guilt of accused after notice by the officers who propounded the questions that any statement would be used against him, does not render the confession inadmissible.

### Criminal Law—Confessions—Admissions.

8.   Where the sheriff and the prosecutor warned accused that any statement he made would be used against him, and that it was unnecessary for him to make any statement, it was unnecessary for the deputy sheriff, before propounding questions to accused, to again caution him.

**Criminal Law—Evidence—Confessions.**

9. Where accused's confession was reduced to narrative form at his dictation and read over and signed by him, it is admissible, though not in his exact language.

**Criminal Law—Evidence—Opinion Testimony.**

10. When the matter under consideration before a jury is of such a character that anyone of ordinary intelligence, without any peculiar course of study, is able to form a correct opinion, expert testimony is inadmissible; therefore, in a prosecution for homicide, where accused's confession, in which he admitted that he and another choked deceased in robbing her, was in evidence and there was medical testimony that deceased's death resulted from strangulation, a further statement by the medical expert that the death was not accidental was inadmissible.

**Criminal Law—Appeal—Harmless Error.**

11. In view of Article VII, Section 3, of the Constitution, providing for the disregarding of harmless error, the erroneous admission of expert testimony that the death of deceased was not accidental was harmless, where the jury could not have drawn any other inference from the testimony, there being testimony that deceased died of strangulation, and accused's confession that he and another choked her in the pursuance of a plan to commit larceny being in evidence.

**Homicide—Defenses—Instructions.**

12. In a prosecution for murder claimed to have been committed in pursuance of a design to commit larceny, where accused stated in his confession that he took several drinks of whisky within an hour or so before the killing, an instruction in accordance with Section 1527, L. O. L., that no act committed by a person while in a state of voluntary intoxication shall be deemed less criminal by reason of his having been in such condition, but whenever the actual existence of any particular motive is necessary to constitute any particular degree of crime, the jury may take into consideration the fact that accused was intoxicated, was warranted.

**Homicide—Defenses—Intoxication.**

13. Voluntary intoxication cannot reduce a homicide to manslaughter.

**Criminal Law—Trial—Instructions—"Murder in Second Decree."**

14. Section 1894, L. O. L., declares that if any person shall purposely and maliciously, but without deliberation and premeditation or in the commission of, or attempt to commit, any felony other than arson, etc., kill another, such person shall be deemed guilty of murder in the second degree. Accused was charged with murder in the second degree, it being the state's contention that he and his confederate choked deceased to death in furtherance of a scheme to commit larceny. The court charged that under the indictment it was not necessary to prove either a purpose to kill, or deliberate and premeditated malice; the indictment having alleged murder while engaged in the commission of larceny in a dwelling-house, and that proof of larceny and the killing would make out a case. By a subsequent instruction the court informed the jury that in a prosecution for homicide committed in pursuance of a felony, the expression, "purposely and maliciously," contained in the. statute, did not apply. *Held*, that the instruc-

tions, taken together, were sufficient, and not susceptible of misleading the jury.

### Homicide—"Murder in the Second Degree"—Commission of a Felony.

15. Under Section 1894, L. O. L., the killing of a human being in the commission of a felony constitutes "murder in the second degree," though there was no specific intent to kill and accused only intended to commit the felony.

### Criminal Law—Trial—Instructions.

16. Where other instructions correctly charged the jury as to reasonable doubt, an instruction is not susceptible of attack on the ground that it failed to include the element of reasonable doubt, for the instructions should be considered as a whole.

### Homicide—Murder in Second Degree—"Dwelling-house."

17. Where the indictment charged that accused killed deceased in committing larceny in a dwelling-house and it appeared that deceased, a woman, had constantly lived, slept and eaten her meals in the house for some two months prior to the killing, the house must, in view of Sections 2389, 2390, L. O. L., declaring that any building is a "dwelling-house," any part of which has usually been occupied by any person lodging therein at night, be deemed a dwelling-house, notwithstanding the woman may have used the premises as a disorderly resort.

### Criminal Law—Trial—Accomplice's Testimony.

18. An instruction that a conviction cannot be had upon the testimony of an accomplice unless he be corroborated by other evidence and that to warrant conviction such corroborating evidence must not only show the commission of the crime and the circumstances of its commission, but must be such as to connect defendant with the crime charged, is correct under Section 1540, L. O. L., declaring that a conviction cannot be had upon the testiony of an accomplice, unless he is corroborated by other evidence tending to connect accused with the commission of the crime, and it is not sufficient to merely show the commission of a crime.

### Criminal Law—Appeal—Harmless Error.

19. In a prosecution for homicide committed pursuant to a plan to commit larceny in a dwelling-house, one who had agreed to participate with accused and another in the offense, but had withdrawn before any overt act was taken, testified for the state. The court charged that a conviction could not be had on accomplice's testimony, unless the accomplice was corroborated by evidence tending to connect accused with the crime. *Held* that the error, if any, in the giving of the charge was not prejudicial; it being to accused's advantage that the testimony of the witness should be treated as that of an accomplice.

### Criminal Law—Trial—Instructions.

20. No complaint can be made of instructions which were correct and were necessary to advise the jury of the crime charged, so that they might intelligently apply the evidence; such instructions not giving undue prominence to any phase of the case.

## From Lake: BERNARD DALY, Judge.

In Banc.   Statement by MR. JUSTICE BEAN.

Tommy Morris and Martin Anchoberry were jointly indicted for the crime of murder committed while engaged in the commission of larceny in a dwelling-house. Morris was separately tried and convicted and he appeals.   The indictment omitting the formal parts reads as follows:

"The said Martin Anchoberry and Tommy Morris on the 9th day of January, A. D. 1915, in said county of Lake and State of Oregon, then and there being and acting together, were then and there unlawfully and feloniously engaged in the commission of the following felony, to-wit: The crime of larceny in a dwelling house, by then and there unlawfully and feloniously taking, stealing and carrying away in a dwelling house currency, gold coin and silver coin, lawful money of the United States, of the value of One Hundred Five Dollars, the money and property of Bertha Bronson; and the said Martin Anchoberry and Tommy Morris, while then and there engaged in the commission of such larceny in a dwelling house did then and there unlawfully and feloniously assault the said Bertha Bronson by then and there choking and strangling her whereof she, the said Bertha Bronson, then and there died."

AFFIRMED.   REHEARING DENIED.

For appellant there was a brief over the names of *Mr. W. Lair Thompson* and *Messrs. Batchelder & Combs,* with oral arguments by *Mr. Charles H. Combs* and *Mr. Thompson.*

For the State there was a brief over the names of *Mr. George M. Brown,* Attorney General, and *Mr. O. C. Gibbs,* District Attorney, with an oral argument by *Mr. Brown.*

MR. JUSTICE BEAN delivered the opinion of the court.

1. The defendant Morris demurred to the indictment upon the ground that it did not comply with the requirements of Chapter 2, Title XVIII, L. O. L., and assigns the overruling of the demurrer as error. Counsel for defendant argue that the indictment does not directly aver the larceny, but merely alleges a conclusion. Section 1894, L. O. L., provides that if any person shall, purposely and maliciously, but without deliberation and premeditation, or in the commission or attempt to commit any felony, other than rape, arson, robbery, or burglary, kill another, such person shall be deemed guilty of murder in the second degree. The form of an indictment in such a case is prescribed by No. 4, p. 1010, L. O. L., in connection with No. 12, p. 1012. The indictment complies substantially with the forms prescribed by the statute: *State* v. *Hosmer,* 72 Or. 57 (142 Pac. 581). The acts constituting the crime are set forth clearly and distinctly, in ordinary and concise language, and in such a manner as to enable a person of common understanding to know what is intended thereby, and is sufficient: Sections 1437, 1438, 1439, L. O. L.; *State* v. *Brown,* 7 Or. 199; *State* v. *Dilley,* 15 Or. 73 (13 Pac. 648); *State* v. *Childers,* 32 Or. 122 (49 Pac. 801); *State* v. *McAllister,* 67 Or. 480 (136 Pac. 354). The criticism is that the indictment does not directly allege that the defendants "took, stole and carried away," etc. The pleading plainly avers that the killing was done while the defendants were feloniously "taking, stealing and carrying away in a dwelling house" certain described property. *State* v. *Brown, supra,* is decisive upon this point.

2. After each of the regular panel of jurors in attendance, except Venireman Goff, had been examined

and excused, and before any juror had been accepted, and after Mr. Goff had stated upon his *voir dire* that he was a juror in the previous trial of Martin Ancho-berry, the following question was addressed to him by the district attorney: "Who was the juror who wanted to convict both defendants on the Anchoberry case?" To this remark exception was taken by defendant's counsel. Upon objection by defendant the court reminded counsel that such conduct was entirely improper and expressed a hope that it would not occur again. The juror was excused and as there was no other juror in the jury-box or shown to be within hearing of the remark we cannot see how the rights of defendant were in any way prejudiced. Thereafter when any juror was called he could be examined as to whether he had heard anything about the occurrence.

3. After a special venire had been summoned upon the examination of Venireman Smith as to his qualifications as a juror he stated in effect that from what he had heard he had an impression that a crime had been committed; that the opinion did not go to the guilt or innocence of the defendant Morris. To the question: "And you think you have reasonable grounds for supposing that a crime has been committed?" he answered: "Yes, I think I have." Thereupon the district attorney stated: "I think any reasonable man would have that impression." To this remark of the district attorney exception was taken and error is assigned thereto. Upon the juror stating that he could and would, if accepted as a juror, lay aside the opinion that a crime had been committed and try the case solely upon the evidence, counsel for defendant withdrew their challenge of the juror and he was accepted. Defendant did not request any ruling of the court upon the matter or ask that the jury be instructed to disregard the same.

The statement of the juror, in which counsel for the state by his remark unnecessarily concurred, was not after explanation made by the juror considered sufficient upon which to base a challenge. The mere exception to the remark of counsel without obtaining or attempting to obtain a ruling thereon by the trial court is not of sufficient materiality to be considered upon appeal: *State* v. *Lee Ping Bow,* 10 Or. 27; *State* v. *Anderson,* 10 Or. 456; *State* v. *Abrams,* 11 Or. 169 (8 Pac. 327); *State* v. *Drake,* 11 Or. 396 (4 Pac. 1204); *State* v. *Hatcher,* 29 Or. 309 (44 Pac. 584).

We pass next to the main question in this case. Assignments of error Nos. 5 to 8 relate to the reception in evidence over the objection and exception of defendant's counsel of a written confession of defendant and admissions made by him on the ground that the same were involuntary. Before the admission of the confession testimony was taken to show whether or not the same was voluntary.

W. B. Snider, sheriff of the county, testified in part as follows:

"When Tommy arrived at the office in the company of Mr. Caldwell, the deputy, I took him into the private office on the north side of the hall in company with Mr. Rinehart and myself and I told him that the Frenchman, Martin Anchoberry, had made a confession in which he implicated him in the murder of that woman, and I asked him if he wanted to see some of his folks or an attorney. If he wanted to he had better call for some of his folks or an attorney and he said he didn't. I told him 'You understand if you make any statements they will be used against you, if you talk at this time.' In fact, I urged him to talk to some of his folks before he made any statement and he didn't wish to do it."

Snider stated that afterwards the district attorney warned the defendant; that no threat or promise was

made to Morris by anyone at the time of his examination. On cross-examination the sheriff testified:

"Q. Well, you didn't say to Tommy, a boy you have known for years, and whom you say you didn't at that time believe to be guilty, 'Now, Tommy, it will be better for you to tell all you know about this matter if you know anything about it'?

"A. I may have said it, I don't know. I would not be positive that I did, but it don't seem to me, * *

"Q. Did you say to him anything to the effect that it would be better for him to tell you if he knew anything about what happened?

"A. No, I don't think I told him it would be better for him because I realized that it would not and warned him to that effect.

"Q. Did you say to him at that time, 'Tommy, you ought to tell all you know about this matter and if you do tell I will do anything I can to assist you'?

"A. I don't know. Afterwards I did."

E. E. Rinehart, the deputy sheriff, testified to the effect that Sheriff Snider and the district attorney warned defendant that any statement he might make would be used against him; that he did not need to make any statement unless he wanted to, and that the sheriff asked him if he wanted to see his folks or wanted an attorney and he said "No"; that he remained in the office with the defendant during the noon hour while the sheriff and district attorney were out; that he talked to defendant quite a while and Morris asked him some questions about his former reputation. As to the conversation regarding the homicide, Mr. Rinehart said:

"As near as I can tell in the exact words, it was just about this way: After we talked a while I told him, I said you heard what Willie Arzner has said and the Frenchman has made a complete statement and has implicated you and I said, 'the fact of the matter is

you was up there at the death of that woman the other night.' He nodded his head and said he was.

"Q. You say you had talked some prior to that,— what was that talk?

"A. He asked me some questions, if I knew anything about his past reputation, if he had ever done anything before.

"Q. What did you tell him?

"A. I said I didn't know of anything.

"Q. Was that the extent of the conversation that led up to this?

"A. Yes. * *

"A. He said 'I didn't kill her. * * I just held her hands.' "

On cross-examination Mr. Rinehart stated: "I did say this, 'You had just as well tell me.' "

C. C. Gibbs, district attorney, deposed in substance, that:

"I told the defendant, Tommy Morris, that the Frenchman, Martin Anchoberry, had made a confession and had implicated him in the killing of that woman. That we wanted to question him concerning the facts; that he need not answer any questions which were put to him unless he wanted to, but that if he did answer questions which were put to him or made any statements which incriminated himself they would be used against him. * * After I had told Tommy that any statement he might make would be used against him we then began to question him. We questioned him concerning his whereabouts on the night of the crime; what different places he had been; what he had done; who he was with, etc., and we would check up his statement to find out to our own satisfaction whether he was telling the truth or not. Then Mr. Snider would question him a while; I think Mr. Snider and I did most of the questioning. I believe Mr. Rinehart asked a question or two. This examination continued until about noon. During that time we had Willie Arzner in the room confronting the defendant Tommy Morris, and I

think Johnny Frakes, but I am not sure about Johnny Frakes."

This witness further testified that after they returned to the office from lunch the defendant gave an outline of the things leading up to the crime and its commission, and the district attorney wrote the statement in narrative form; that this was read to the defendant who signed and swore to it. On cross-examination he stated that it was the custom of his office to examine a defendant before the latter consulted an attorney.

Tommy Morris, defendant, testified that Rinehart—

"told me to tell the truth, it would be better for me and he would do all he could for me"; that Sheriff Snider said "he knew I was into it for the Frenchman said I was and it would be better for me to own up to it. * * He told me to tell the truth and they would do all they could for me. * * I don't know as he used them words but that is what I took it for."

Morris stated that he was in the sheriff's private office ten or fifteen minutes.

The foregoing is in substance a fair portrayal of the manner in which the confession was obtained.

4. It is elementary that a confession to be admissible against one charged with crime must be shown by the prosecution to be voluntary; that is, that it has not been induced by hope or fear: Section 1537, L. O. L.; Underhill, Crim. Evid. (2 ed.), § 126; *State* v. *Wintzingerode,* 9 Or. 153; *State* v. *Spanos,* 66 Or. 118 (134 Pac. 6); *State* v. *Garrison,* 59 Or. 440 (117 Pac. 657).

5, 6. The testimony shows that before the examination of Morris was begun he was fully informed of the nature of the charge pending against him; that he was advised to consult his people or an attorney before making any statement, and was warned before he made any statement at all and again after he had admitted

his guilt, that any incriminating statement he might make would be used against him: See *State* v. *Inman,* 70 Kan. 894 (79 Pac. 162). The examination throughout was conducted in a quiet and orderly manner, and nothing was said or done which could have raised either fear or hope in the mind of the defendant. The only statement which could possibly have raised any hope in the defendant was that made to him by Sheriff Snider some hours after the examination was over to the effect that he would do what he could for him, but it was impossible for this remark to have induced the confession as it was made long after defendant confessed. The rule is well settled that the determination of the court on a criminal trial that a confession of defendant was obtained from him without the influence of hope or fear exercised by a third person, will not be disturbed on review unless there is clear and manifest error: *State* v. *Rogoway,* 45 Or. 601, 607 (78 Pac. 987, 81 Pac. 234, 2 Ann. Cas. 431); *State* v. *Blodgett,* 50 Or. 329 (92 Pac. 820); *State* v. *Spanos,* 66 Or. 118 (134 Pac. 6). The testimony of Morris conflicts with that of the officers. This is to be expected in the trial of a criminal action where a defendant repudiates his confession. The trial court found that the confession was voluntary, and after reading all the evidence touching upon the matter we believe there was no error committed in admitting the confession.

7. The most favorable statement for the defendant that can be made is that Morris' confession was made in answer to questions assuming his guilt; but this does not render it inadmissible. The rule is settled that a confession made in answer to questions which assume the guilt of the accused is not on that account involuntary, when the same is made to an officer after notice to the accused that any statement that he may make

will be used against him in the trial of the case, if one should develop, and that he is not required to make any statement unless he desires to do so, and there are no accompanying circumstances shown, calculated to produce fear or hope: *State* v. *Blodgett,* 50 Or., at page 334 (92 Pac. 820); Wharton, Crim. Evid. (10 ed.), §§ 662, 663; 12 Cyc. 468; 18 L. R. A. (N. S.) 768, 794, notes; *State* v. *Robinson,* 117 Mo. 649, 650 (23 S. W. 1066); *People* v. *Kennedy,* 159 N. Y. 346 (54 N. E. 51, 70 Am. St. Rep. 557).

8. The warnings given to the defendant by the sheriff and district attorney before he was questioned in regard to what he knew about the commission of the crime were sufficient to inform him that anything he said would be used against him; and the information that he had a right to refrain from making any statement overcomes any possible inference of duress that might otherwise be drawn from the form or manner of the interrogatories that were propounded to him. No threat or promise appears to have been made to the defendant of such a nature that he would be likely to tell an untruth by magnifying the part he took in the commission of the crime or in stating facts prejudicial to himself through fear or hope of any profit. After the sheriff had cautioned the prisoner in the presence of Rinehart, the deputy, before he made any admission, it was not necessary for the deputy to make a similar statement to the accused.

9. The confession was reduced to narrative form at the defendant's dictation and was read over and signed by him. It is not inadmissible because it fails to be a *verbatim* statement of his. It is sufficient that it contains what was said in substance by the defendant, the recital of his exact words being unnecessary. The rule is settled that a confession taken down by someone else

and read to and signed by the accused is as much his written declaration as one entirely prepared by his own hand would be; and this is true although his exact language is not reduced to writing. By signing it and adopting its language, he makes it his own: *State* v. *Berberick,* 38 Mont. 423 (100 Pac. 209, 16 Ann. Cas. 1077); *People* v. *Giro,* 197 N. Y. 152 (90 N. E. 432). The ruling of the trial court that the confession of the defendant was voluntary is approved. We believe this disposes of the pivotal question in the case.

10, 11. Before the confession of Morris was introduced in evidence Dr. E. H. Smith was called by the state and qualified as a medical expert. He testified to the purport that about thirty minutes after the homicide he was called and made an examination of the body of the deceased and that there were finger marks on the throat, three on the left side and one on the right; that some of the small blood vessels inside the throat were ruptured and there was a slight hemorrhage from the inside and also under the skin; that from the examination it was his opinion that the woman came to her death from strangulation; and that it was not self-inflicted. Over the objection and exception of defendant's counsel the witness was allowed to state further that "my opinion was it was not accidental." This is assigned as prejudicial error. The confession and statements of the defendant Morris showed plainly that upon the proposal of the defendant Anchoberry it was planned by the two to go to the place of the victim and "choke her down" and take the money which she had in the house; that pursuant to the plot they did so, and that Morris held the decedent's hands during a part of the time that Anchoberry was choking her. As we have stated, the case turns upon the admissibility of Morris' confession

and admissions to which we have referred. The jury was just as competent as the physician to say from the facts and circumstances delineated by the witnesses, whether or not the strangulation was caused accidentally: *State* v. *Jennings,* 48 Or. 483 (87 Pac. 524, 89 Pac. 421); *Pacific Ry. & Nav. Co.* v. *Elmore Packing Co.,* 60 Or. 534 (120 Pac. 389, Ann. Cas. 1914A, 371); *State* v. *Barrett,* 33 Or. 194, 196 (54 Pac. 807); *Knoll* v. *State,* 55 Wis. 249 (12 N. W. 369, 42 Am. Rep. 704); Underhill, Crim. Ev., § 312, p. 373. When the matter under consideration before a jury is of such a character that anyone of ordinary intelligence, without any peculiar habits or course of study, is able to form a correct opinion of the same, expert testimony as to such matter is inadmissible; but when, upon the whole case, it is manifest that if such testimony had not been introduced, the jury could not have reached a different conclusion from that expressed in the opinions of the experts, the admission of such evidence will be regarded as a harmless error: *Fisher* v. *Oregon S. L. etc. Ry. Co.,* 22 Or. 533 (30 Pac. 425, 16 L. R. A. 519). The statement of the defendant Morris, which we think was properly admitted in evidence, was practically a plea of guilty or a full admission that he was guilty of the crime, and the jury could not from the evidence, other than that of the opinion of the Doctor which was excepted to, reasonably have found that the death was caused by an accident. Therefore, it is impossible for the evidence to which exception was taken, to have changed the verdict, or in any degree to have prejudiced the rights of the defendant, and the assigned error was harmless. It would not justify a reversal of the judgment: *Fisher* v. *Oregon Short Line etc. Ry. Co.,* 22 Or. 533 (30 Pac. 425, 17 Am. Neg. Cas. 227; 53 Am. & Eng. R. Cas. 539, 16 L. R. A. 519); Article VII,

Section 3 of the Constitution of Oregon; *Longfellow* v. *Huffman,* 57 Or. 338, 343 (112 Pac. 8); *Obenchain* v. *Ransome Crummey Co.,* 69 Or. 547 (138 Pac. 1078, 139 Pac. 920).

12. Exception was saved to an instruction that "voluntary" intoxication is not available as a defense on behalf of the defendant, for the reason that the instruction assumes that he was intoxicated and that the same was prejudicial. Section 1527, L. O. L., directs that:

"No act committed by a person while in a state of voluntary intoxication shall be deemed less criminal by reason of his having been in such condition; but whenever the actual existence of any particular motive, purpose, or intent is a necessary element to constitute any particular species or degree of crime, the jury may take into consideration the fact that the defendant was intoxicated at the time, in determining the purpose, motive, or intent with which he committed the act."

The only evidence before the jury of any intoxication upon the part of the defendant is that contained in his confession which recites that within an hour or so immediately before the killing he took several drinks of whiskey. The degree to which he was intoxicated does not clearly appear; but from the number of drinks taken he must have been intoxicated to some degree. The evidence, however, tended to show that it was entirely voluntary. It was sufficient to warrant the instruction complained of: 11 Enc. of Plead. & Practice, 181; *State* v. *Zorn,* 22 Or. 591 (30 Pac. 317); *State* v. *Hansen,* 25 Or. 401 (35 Pac. 976, 36 Pac. 296.)

13, 14. Section 1894, L. O. L., provides that if any person shall (purposely and maliciously, but without deliberation and premeditation) or in the commission or attempt to commit any felony other than rape, arson, robbery, or burglary, kill another, such person shall be deemed guilty of murder in the second degree.

The court charged the jury by instruction No. 19, in effect, that:

"Under this indictment it is not necessary to prove expressly either a purpose to kill, or deliberate and premeditated malice.

"The indictment having alleged murder while engaged in the commission of larceny in a dwelling house, it is only required that the larceny and the killing, in the manner alleged during the larceny be proven to make out the case: * * "

—and that under proof of such a case the intent to kill is implied.

By instruction 12½, in explaining to the jury that upon the prosecution for murder in the second degree alleged to have been committed during the commission of larceny in a dwelling-house, the clause "purposely and maliciously," etc., contained in Section 1894, included above in parentheses, did not apply, the court used the words "specific intent" apparently in the sense of purpose. See Webster's International Dictionary, for definition of the words "intent" and "purpose." Voluntary intoxication cannot reduce a homicide to manslaughter: *State* v. *Weaver,* 35 Or. 417 (58 Pac. 109). This instruction, taken together with number 19, is not subject to misunderstanding by the jury.

15. Where a killing of a human being is done in the commission of a felony described in Section 1894, L. O. L., the ultimate purpose may be to effect the larceny or felony, and although there may be no purpose or specific intent to kill, if the killing is done in the commission of the alleged felony it will nevertheless be murder in the second degree: 21 Am. & Eng. Ency. Law (2 ed.), pp. 133, 165, and 169; *State* v. *Brown,* 7 Or. 198, 199.

16. Further exception was saved to instruction No. 19, because it fails to include the element of reasonable

doubt. The instruction complained of does not constitute ground for reversal when considered in connection with five or six others which had already been given and which correctly defined reasonable doubt. The court instructed the jury as to the essential elements of the crime charged and informed them that they could not convict the defendant, unless every such element had been proved to their satisfaction beyond a reasonable doubt. The instructions should be considered as a whole and when they are substantially correct and could not have misled the jury to the prejudice of the defendant, the judgment will not be reversed because some instruction considered alone may be subject to criticism: *State* v. *Anderson,* 10 Or. 462; *State* v. *Morey,* 25 Or. 241 (35 Pac. 655, 36 Pac. 573); *State* v. *Hansen,* 25 Or. 401 (35 Pac. 976, 36 Pac. 296.); *State* v. *Megorden,* 49 Or. 259 (88 Pac. 306, 14 Ann. Cas. 130). In accordance with this rule it is apparent that no reversible error was committed.

17. It is asserted on behalf of defendant that the evidence did not show that a crime had been committed, as alleged in the indictment, for the reason that the evidence shows that the building in which the homicide occurred was a bawdy-house. Several assignments of error refer to the giving, or refusal to give, instructions with reference to the character of the house in which the homicide was committed. The evidence shows that for two months previous to the murder the woman had constantly lived, slept, and eaten her meals in the house in which she was killed. She occupied two rooms therein and it was in one of these that she was killed. A dwelling-house is a building, any part of which is usually occupied by some person lodging therein at night: Sections 2389, 2390, L. O. L.; 10 Am. & Eng. Enc. Law (2 ed.), 353, 354; 3 Words &

Phrases, pp. 2288, 2294; *State* v. *O'Neil,* 21 Or. 170 (27 Pac. 1038) ; *People* v. *Horrigan,* 68 Mich. 491 (36 N. W. 236) ; *State* v. *Warren,* 33 Me. 30. That the woman may have used the house for immoral purposes does not alter the fact that it was her dwelling. The cases all hold that a building, any part of which is usually occupied by some person lodging therein at night is a dwelling-house within the meaning of the law, in regard to arson, burglary or larceny in a dwelling-house notwithstanding the building is used for other purposes. By the same reason, therefore, a house in which a woman lives and makes her home is her dwelling-house within the meaning of the statute notwithstanding she may have been guilty of immoral practices therein. The law protects the dwelling of the ungodly as well as that of the righteous.

18, 19. The court charged the jury under Section 1540, L. O. L., to the effect that a conviction cannot be had upon the testimony of an accomplice unless he be corroborated by other evidence : See section noted. In order to be sufficient to warrant a conviction such corroborating evidence must not merely show that a crime had been committed or the circumstances of its commission, but it must be such as tends to connect the defendant with the crime charged. Counsel for defendant saved a general exception to the charge because there is no issue in the case to justify it. It was not specifically pointed out to the trial court wherein the instruction was not justified by the issues. There was no request that it be withdrawn : See *Carroll* v. *Grande Ronde Elec. Co.,* 52 Or. 376 (97 Pac. 552) ; *Kearney* v. *Snodgrass,* 12 Or. 311 (7 Pac. 309). John Frakes according to his testimony had planned to undertake the robbery of the house in conjunction with defendant Tommy Morris and one Martin Anchoberry, but with-

drew from the plan and stated to them that he would take no part in it; and the evidence tended to show that a new design with the same thing in view was carried out by Morris and Anchoberry some days after the time that Frakes was to participate. Counsel for the state conceded that it does not seem that Frakes was an accomplice in the commission of the alleged crime. The instruction complained of was favorable to the defendant. The only possible effect that such part of the charge could have upon the minds of the jury would cause them to discredit the damaging testimony given by John Frakes against the defendant. Therefore, instead of having misled the jury to the prejudice of the defendant the instruction was in his favor. The instruction was in strict conformity with Section 1540, L. O. L., and entirely in accord with the law. While the charge to the jury should be confined to the facts in the case the defendant could not have been prejudiced thereby although it was outside the issues. It being favorable to the party complaining we are convinced that the charge criticised did not mislead the jury. It is not ground for reversal: *State* v. *Weaver,* 35 Or. 415 (58 Pac. 109); *State* v. *Selby,* 73 Or. 378 (144 Pac. 657); 1 Blashfield, Inst. to Juries, § 91; 38 Cyc. 1621, 1622.

20. The defendant criticises several of the instructions because they repeated to the jury definitions of murder in the second degree. It is not contended that either of these instructions is erroneous in that they do not correctly state the law. From a reading of them it is apparent that they were all necessary to fully advise the jury of the crime charged and instruct them with reference to the law in order that they might intelligently apply the evidence which had been adduced before them. No undue prominence appears to have

been given to any phase of the case by these instructions and we find no error committed therein: See *Gran* v. *Houston,* 45 Neb. 813 (64 N. W. 245); *Commonwealth* v. *Snelling,* 32 Mass. (15 Pick.) 321. The charge to the jury fairly submitted the questions of fact in the case to them.

From a careful examination and consideration of the record in the case we find no reversible error in the trial thereof. The judgment of the lower court is therefore affirmed.        AFFIRMED.    REHEARING DENIED.

MR. JUSTICE HARRIS (Concurring Specially).

The assignments of error, challenging the confession made by Tommy Morris, relate to a writing signed by him, refer to oral statements concerning money stolen from the decedent and then hidden, and involve verbal declarations about blood stains on a coat and shirt worn by the defendant.

As a preliminary to a discussion of the circumstances attending the making of the confession, it will be appropriate to notice the rule by which the competency of the confession must be measured. Notwithstanding the phraseology of Section 1537, L. O. L., the common-law rules governing the admissibility of confessions are still in force in this state; *State* v. *Wintzingerode,* 9 Or. 153, 162; *State* v. *Moran,* 15 Or. 262, 265 (14 Pac. 419); and therefore to be admissible a confession must be free and voluntary and not made under the influence of fear produced by threats nor induced by the expectation of any promised benefit; 12 Cyc. 461. A voluntary confession is admissible even though it is made while in the custody of an officer: *State* v. *Blodgett,* 50 Or. 329, 334 (92 Pac. 820); *State* v. *Scott,* 63 Or. 444, 449 (128 Pac. 441); *State* v. *Humphrey,* 63 Or. 540, 552 (128 Pac. 824); *State* v. *McPherson,* 70 Or. 371, 373 (141 Pac.

1018); nor will a prisoner's confession be excluded as evidence merely because it was obtained in answer to questions which assumed his guilt: *State* v. *Blodgett,* 50 Or. 329, 334 (92 Pac. 820). If the confession is voluntary the prosecution is entitled to have it go to the jury, but if it is not voluntary it must not have any influence upon the verdict.

This quality of voluntariness, so necessary to a confession, presents itself at two stages of a trial: (1) To the judge; and (2) to the jury. The judge passes upon the admissibility and the jurors are the exclusive judges of the weight and credibility of the confession. The decision of the judge is only preliminary while that of the jury is ultimate. The preliminary question is addressed entirely to the judge for at that stage of the trial the sole query is: Is the confession admissible? *State* v. *Blodgett,* 50 Or. 329, 332 (92 Pac. 820); *State* v. *Spanos,* 66 Or. 118, 120 (134 Pac. 6). A confession becomes admissible as evidence when the prosecution shows *prima facie* that it was voluntary and while the judge may, if he chooses, at that stage of the trial permit the defendant to offer affirmative evidence to controvert the testimony of the prosecution, nevertheless, the judge is not obliged to hear the witnesses for the defendant before admitting the confession. If the confession is admitted by the judge and if it comes to the jury with conflicting evidence as to whether it was voluntary, the jurors are not bound to assume that the confession was made voluntarily simply because the judge held that it was admissible. To hold that the decision of the judge is the end of the matter and that his ruling of itself binds the jurors to say, or at least assume, that the confession is in truth voluntary is to take from the jurors the right to decide a vital fact. The judge can say whether a confession

shall be submitted to the jurors for their consideration but it is their exclusive province to say whether in the presence of conflicting evidence they will attach any weight to it, and the law prescribes that a confession must not be given any weight if it is not voluntary. The province of the judge is to determine, not whether the confession was in fact voluntary, but whether a sufficient *prima facie* showing is made to warrant a finding that it was voluntary. If the judge tries out the preliminary question of the admissibility of the confession by hearing all the evidence on both sides in the presence of the jurors and if he receives the confession and allows it to go to the jury then the triers of the facts have a right to consider all the evidence in determining how much weight and credibilty should be given to the confession; and so, too, if the preliminary question is decided in the absence of the jury, either party is entitled upon demand to have the jury hear the witnesses tell about the circumstances which relate to the voluntariness of the confession. There are authorities to the contrary, but they ignore the distinguishing differences between the functions of the judge and those of the jury. The views expressed here are not only governed by the latest decisions of this court but are also sustained by well considered precedents in other jurisdictions: *State* v. *Doris,* 51 Or. 136 (94 Pac. 44, 16 L. R. A. (N. S.) 660); *State* v. *Fuller,* 52 Or. 42, 47 and 48 (96 Pac. 456); 12 Cyc. 482; 1 R. C. L., pp. 582–585; *State* v. *Wells,* 35 Utah, 400 (100 Pac. 681, 136 Am. St. Rep. 1059, 19 Ann. Cas. 631).

The trial court admitted the confession after hearing the witnesses for the state and also those for the defendant, and since the preliminary inquiry was addressed to the judge who saw and heard the witnesses, his decision should not be disturbed unless the record

discloses clear and manifest error: *State* v. *Wintzin-gerode,* 9 Or. 153, 165; *State* v. *Rogoway,* 45 Or. 601 (78 Pac. 987, 81 Pac. 234, 2 Ann. Cas. 431); *State* v. *Roselair,* 57 Or. 8 (109 Pac. 865); *State* v. *Blodgett,* 50 Or. 329 (92 Pac. 820); *State* v. *Humphrey,* 63 Or. 540 (128 Pac. 824); *State* v. *Spanos,* 66 Or. 118 (134 Pac. 6).

The question to be answered upon this appeal is whether the court was justified in submitting the confession to the jury, and that question does not necessarily require us to determine whether the confession was in fact voluntary. It will not be practicable to give more than a brief outline of the circumstances surrounding the confession as recorded in seventy typewritten pages of the transcript of the evidence. Tommy Morris was arrested and delivered to the sheriff at his office about 9:30 or 10:00 A. M. on January 12, 1915. The sheriff immediately took the defendant "into his private office" in company with E. E. Rinehart, a deputy sheriff, where in the language of the sheriff:

"I told him that the Frenchman, Martin Anchoberry had made a confession in which he implicated him in the murder of that woman, and I asked him if he wanted to see some of his folks or an attorney. If he wanted to he had better call for some of his folks or an attorney and he said he didn't. I told him, 'You understand if you make any statements they will be used against you, if you talk at this time.' In fact, I urged him to talk to some of his folks before he made any statement and he didn't wish to do it."

The sheriff is corroborated by the deputy who testified that the former said to the defendant: "Do you want to see your folks or do you want an attorney?" Morris answered: "No I don't want to see anybody"; and then the sheriff warned the defendant "that any-

thing he might say, if he was implicated in the murder, would be used against him and he didn't need to make any statement unless he wanted to.'' The sheriff testified that he felt friendly towards the defendant because he had known Morris since the time the latter was a small boy and that he did not at first believe that the defendant was guilty. Morris was not questioned any further until after the arrival of the prosecuting attorney. When the prosecuting attorney arrived at the sheriff's office he warned the defendant thus:

''I told the defendant, Tommy Morris, that the Frenchman, Martin Anchoberry, had made a confession and he had implicated him in the killing of that woman. That we wanted to question him concerning the facts; that he need not answer any questions which were put to him unless he wanted to, but that if he did answer questions which were put to him or made any statements which incriminated himself they would be used against him.''

The sheriff and his deputy both say that Morris was warned in the manner testified to by the prosecuting attorney. The defendant was then questioned and the questioning continued off and on until about noon.

About 12:30 P. M. the sheriff and the prosecuting attorney went to lunch leaving Rinehart with Morris in the sheriff's office for the reason that the latter said that he did not want any dinner. During the absence of the sheriff and prosecuting attorney the defendant made an oral confession to Rinehart. Upon their return the sheriff and prosecuting attorney were informed of what had transpired; but, before proceeding further the prosecuting attorney says that: ''I again told him that any statement that he might make would be used against him.'' Corroboration is found in the testimony of Rinehart who swore that the prosecuting

attorney "told him any statement he might make would be used against him and Mr. Snider (the sheriff) told him the same thing"; and the sheriff says that: "I think afterward, when I came back from dinner we again warned him about making statements." After warning the defendant they commenced to reduce the confession to writing and at the end of about two hours the writing was finished and signed by the defendant. At some time during the afternoon the defendant accounted for the blood spots on his shirt and coat by explaining that during the struggle Bertha Bronson bit Anchoberry's finger causing it to bleed; and he also revealed the place where he had hidden his share of the money that had been stolen from Bertha Bronson.

It is true that the defendant testified, on direct examination, that when alone with Rinehart the latter "told me to tell the truth, it would be better for me and he would do all he could for me"; and Morris also claimed that when first brought to the sheriff the latter "said he knew I was into it for the Frenchman said I was and it would be better for me to own up to it." It is also true, however, that the cross-examination lessened the force of the direct testimony. The defendant argues that this positive testimony of the defendant together with certain answers made by the sheriff and deputy sheriff render the confession inadmissible. A considerable portion of the cross-examination of the sheriff is here quoted:

"Well, you didn't say to Tommy, a boy you have known for years, and whom you say you didn't at that time believe to be guilty, 'Now Tommy, it will be better for you to tell all you know about this matter, if you know anything about it?'

"A. I may have said it, I don't know. I would not be positive that I did, but it don't seem to me, * *

"Q. Well, did you say anything similar to that?

"A. I think afterward, when I came back from dinner we again warned him about making statements.

"Q. Let's go back to my question, Mr. Snider; whether you made any statements of the kind I have just asked you about.

"A. I can't be sure whether I did or not, I may have.

"Q. Did you say to him anything to the effect that it would be better for him to tell you if he knew anything about what happened?

"A. No, I don't think I told him it would be better for him because I realized that it would not and warned him to that effect.

"Q. Did you say to him at that time, 'Tommy, you ought to tell all you know about this matter and if you do tell I will do anything I can to assist you?'

"A. I don't know.   Afterwards I did.

"Q. When?

"A. After the confession was written down I told him I would do everything I possibly could do for him."

Continuing the sheriff said: "I simply told him, on account of his mother, I would do anything I could" and the witness explained that this statement was made to the defendant in the evening after the confession had been made and after Morris "was put in jail and locked up." A portion of the cross-examination of the deputy reads thus:

"Q. Mr. Rinehart, during the time you and Tommy were there alone didn't you urge upon him to tell you privately, all about what happened up there,—didn't you ask him to tell it to you individually while the rest were gone?

"A. I did say this, 'You had just as well tell me.'

"Q. Didn't you say this: 'Now, Tommy you just as well tell all about it and if you will tell it to me here, I will do all I can?'

"A. No, sir."

Again quoting from the testimony of Rinehart:

"Q. If you discussed that subject from the standpoint of telling the truth at all, in all probability you would say something to him to that effect, if not in those words?

"A. I wouldn't say whether I said that.   I wouldn't say I did and I wouldn't say I didn't."

The sheriff testified that at no time "during the course of the examination" did any person make any threat against the defendant or give any promise to him; that "we simply questioned him as to what he did know" and did not "at any time even request him or urge him to tell what he knew." Rinehart testified that he did not plead with the defendant at the noon hour; that he did not "make any promises of any sort to the defendant"; and that: "I said 'the fact of the matter is you were up there the night of the murder,' and he nodded his head and said yes." Moreover, Rinehart denied saying to the defendant, "It will be better for you to tell the truth, and I will do all I can for you" or that he even used language to that effect.

Standing alone, the testimony of the defendant charging that he was induced to confess by promises does not as a matter of law render the confession inadmissible: 1 R. C. L., p. 584; *State* v. *Ruck*, 194 Mo. 416 (92 S. W. 706, 5 Ann. Cas. 976). The sheriff admits that he did make some promises to the defendant but they were made in the evening after the written confession and subsequent to the statements about the money and blood stains; and, therefore, these admitted promises did not influence the confession. If the confession is inadmissible as evidence it must be on account of previous inducements. In substance the sheriff said that while he could not be sure yet he "may have" stated to Tommy that it would be better to tell what he knew, and the deputy sheriff's statement was that

he said "you had just as well tell me" and that he "might have" told Tommy "it was better for him to tell the truth." This is far from being an admission that they did in fact say to the defendant that it would be better to tell what he knew. It is true that the answers of the officers furnished material which the defendant could use in arguing to the jury that the confession was not voluntary; and yet, on the other hand, the State could argue that what the officers said "may have" happened, in fact did not happen, for the reason that the sheriff, who entertained a friendly feeling for the defendant and at first did not believe him to be guilty, warned Morris and soon afterwards the prosecuting attorney gave the defendant a similar warning. Can it be said that the court committed clear and manifest error when the defendant was twice warned and when according to the testimony of the sheriff, his deputy and the prosecuting attorney, they did not urge or plead with the defendant, nor trick him, nor make threats nor offer promises? Reasonable minds might draw different conclusions from the conflicting evidence in the record but it certainly cannot be said that all reasonble minds would agree that the officers did in truth tell the defendant that it would be better for him to tell what he knew; and the very fact that reasonable minds might draw different conclusions as to the voluntariness of the confession is a forcible argument in behalf of the correctness of the ruling made by the trial court.

It must be remembered, too, that the oral confession made to Rinehart at the noon hour was not offered in evidence, and it must be borne in mind also that the answers of the sheriff and his deputy upon which the defendant relies refer to what "may have" been said in the morning or during the noon hour. Even though it

be conceded that the sheriff and his deputy did actually tell the defendant that it would be better for him to tell what he knew about the murder, or if it be assumed that the oral confession to Rinehart was not voluntary, can it be said that the admission of the confession was clear and manifest error? The inducements, if offered at all, were held out in the morning by the sheriff and at noon by the deputy. Nothing said to the deputy at the noon hour forms any part of the confession offered by the State. The confession received in evidence was made in the afternoon and embraces the writing together with the statements about the money and the blood stains. Before beginning to write both the sheriff and the prosecuting attorney for the second time warned the defendant and this second warning occurred after any inducements that "may have" been offered in the morning. Assuming that the sheriff and the deputy made promises or held out inducements to the defendant in the morning and further assuming that this influence must be presumed to continue to operate unless the contrary is shown by clear evidence, we nevertheless have a situation where in the afternoon both the sheriff and the prosecuting attorney warned the defendant of the consequences of the confession and after such warning the defendant confessed. In *State* v. *Wintzingerode,* 9 Or. 153, 164, the court approved the rule announced in *State* v. *Guild,* 10 N. J. Law, 163 (18 Am. Dec. 404), where it was held that although an original confession may have been improperly obtained, yet a subsequent confession may be admitted if the court believes that from proper warning of the consequences of a confession, or from other circumstances, that the delusive hopes or fears which promoted the original confession, were entirely dispelled; and therefore if it is assumed that the confes-

sion made at the noon hour to Rinehart was induced by promises, nevertheless, we should not reverse the ruling of the trial court but we should be governed by the reason given by this court in *State* v. *Wintzingerode,* when speaking of a similar situation:

"The circuit court had the undoubted right to try the question whether the original influence had ceased when the subsequent confessions were made, and if the record before us disclosed any fact or circumstance to justify the belief that they had in fact ceased, when such subsequent confessions were made, we should not disturb its determination."

Necessarily considerable latitude must be allowed the Circuit Court in deciding whether a confession is admissible and yet it must be conceded that the trial judge should exercise his discretion with great care so that proper enforcement of the law may not be impeded on the one hand, and that no injustice be done the defendant on the other: 1 R. C. L., p. 583.

While different minds might draw different conclusions from the conflicting evidence, yet, there was enough evidence, if believed, to enable a jury to find that the confession was voluntary, and consequently the trial court did not err in submitting the confession to the ultimate triers of the facts. Believing that the trial was free from prejudicial error, I concur in the opinion and conclusion of Mr. Justice BEAN.

MR. JUSTICE BURNETT delivered the following dissenting opinion:

The defendant Morris was brought to trial upon an indictment, the charging part of which is as follows:

"The said Martin Anchoberry and Tommy Morris on the 9th day of January, A. D. 1915, in said county of Lake and State of Oregon, then and there being and acting together, were then and there unlawfully and

feloniously engaged in the commission of the following felony, to wit: The crime of larceny in a dwelling-house, by then and there unlawfully and feloniously taking, stealing and carrying away in a dwelling-house currency, gold coin and silver coin, lawful money of the United States, of the value of One Hundred Five Dollars, the money and property of Bertha Bronson; and the said Martin Anchoberry and Tommy Morris while then and there engaged in the commission of such larceny in a dwelling-house did then and there unlawfully and feloniously assault the said Bertha Bronson by then and there choking and strangling her whereof she the said Bertha Bronson, then and there died."

From a judgment of conviction upon a verdict of guilty as charged, he appeals.

The defendant complains that a paper purporting to be his confession was introduced in evidence over his objection and without sufficient proof that it was made voluntarily; but that on the contrary the testimony shows that it was extorted from him by holding out the inducement to the effect that it would be better for him to confess and by coercion as noted further on. It appears that he is a minor, nineteen years old; that he was arrested by a deputy sheriff, brought to the courthouse and delivered to the sheriff about half-past 9 o'clock in the forenoon of January 12, 1915, and without taking him before the magistrate who issued the warrant of arrest, or any other judicial officer, the sheriff and his deputy, together with the district attorney, proceeded to catechise him about his connection with the crime, telling him that his codefendant had made a confession implicating him. Whether the other party accused had really confessed or not does not appear. The officers mentioned all say, that they told this defendant he need not say anything unless he wished to and that he said he did not want to see an attorney or any of his folks. First one and then the

other questioned him about the matter without results
until noon when the sheriff and the district attorney
went to dinner.   During their absence the deputy sher-
iff in the manner hereinafter delineated succeeded in
getting him to confess and when the prosecuting officer
returned the latter reduced the same to writing, not
putting down all the defendant said, but considerable.
The defendant subscribed his name on each page of the
paper and verified it before the district attorney who
assumed to act as notary public.

Sections 135 and 136, L. O. L., are here set down:

Section 135.   "All questions of fact, other than those
mentioned in section 136, shall be decided by the jury,
and all evidence thereon addressed to them."

Section 136.   "All questions of law including the ad-
missibility of testimony, the facts preliminary to such
admission, and the construction of statutes and other
writings and rules of evidence, are to be decided by the
court, and all discussions of law addressed to it. * * "

As stated in *Redd* v. *State,* 69 Ala. 255, quoted with
approval by this court in *State* v. *Moran,* 15 Or. 262,
265 (14 Pac. 419, 421):

"It is a well established maxim of the law that the
admissibility of evidence is always a question to be de-
termined by the court, and its weight or credibility is
for the determination of the jury.   It is for the court,
therefore, to say whether the confessions of a prisoner
are voluntary or involuntary, and this question being
judicially settled, cannot be reviewed by the jury."

The ruling of the court upon the admissibility of the
testimony, therefore, is the exercise of a judicial func-
tion which we are called upon to review upon the rec-
ord before us.   In *State* v. *Young,* 67 N. J. Law, 223 (51
Atl. 939), the following appears:

"When a convicted person elects to bring up with
his writ of error the entire record of proceedings at the

trial, and specifies as a cause for relief or reversal that he has suffered manifest wrong or injury by the admission in evidence of a statement made by him, offered by the state, and tending to prove guilt, the reviewing court must consider the evidence preliminarily laid before the trial court, and its findings of facts thereon. If such evidence, though pertinent to support such finding, is insufficient in weight to justify the finding, it may be determined that wrong or injury has been done by its admission.''

The only function the jury has in the matter is to estimate the credibility of the evidence, for it is said in Section 868, L. O. L.:

''The jury, subject to the control of the court in the cases specified in this code, are judges of the effect or value of the evidence addressed to them, except when it is thereby declared to be conclusive.''

When, therefore, the court has ruled that a defendant's statement was voluntary, that concludes the investigation about whether it is admissible in evidence. It goes to the jury for what it is worth in their estimation. They must consider it and they cannot review the judgment of the court on its competency. As affecting its weight, however, the jury is entitled to know all the circumstances under which the defendant's utterance was made, and if it should appear to them it was extorted by compulsion or by promise or imparted hope of benefit they would be authorized to disbelieve it the same as they would the ravings of one in delirium of fever or when talking in his sleep.

It is well settled as a principle of law that before a confession is admitted in evidence the prosecution must show that it was freely and voluntarily made, and that if it shall appear that any compulsion moral or physical is applied to him or any inducement is held out to him, as that it would be better for him to confess and the

like, the inculpatory statement of the defendant cannot be received in evidence. Having testified on direct examination in substance that he opened the conversation with Morris by telling him he was implicated in the homicide according to Anchoberry's confession, the sheriff was asked on cross-examination on this subject the following question:

"Well, you didn't say to Tommy, a boy you have known for years, and whom you say you didn't at that time believe to be guilty, 'Now, Tommy, it will be better for you to tell all you know about this matter, if you know anything about it?' "

He answered:

"I may have said it, I don't know. I would not be positive that I did, but it don't seem to me * *

"Q. Let's go back to my question, Mr. Snider; whether you made any statements of the kind I have just asked you about.

"A. I can't be sure whether I did or not, I may have."

The deputy in whose custody the defendant remained during the noon hour was questioned thus:

"Mr. Rinehart, during the time you and Tommy were there alone didn't you urge upon him to tell you privately, all about what happened up there—didn't you ask him to tell it to you individually while the rest were gone?

"A. I did say this, 'You had just as well tell me.'

"Q. When you were maintaining that friendly attitude you told him it would be better for him to tell the truth did you?

"A. I don't know, I might have told him it was better for him to tell the truth. I wouldn't say I did tell him of course."

Further about the interview with the defendant during the noon hour the deputy testified thus:

"Q. Regarding the homicide what did you say?

"A. As near as I can tell you in the exact words, it was just about this way: After we talked awhile I told

him, I said 'you heard what Willie Arzner has said and the Frenchman has made a complete statement and has implicated you' and I said, 'the fact of the matter is you was up there at the death of that woman the other night.' He nodded his head and said he was."

Again, he was interrogated:

"Q. If you discussed that subject from the standpoint of telling the truth at all, in all probability you would say something to him to that effect if not in those words.

"A. I wouldn't say whether I said that. I wouldn't say I did and I wouldn't say I didn't."

The defendant testified thus:

"Q. What, if anything, did Mr. Rinehart say to you regarding your telling the truth, of his agreeing to assist you if you would tell the truth?

"A. He told me to tell the truth, it would be better for me and he would do all he could for me.

"Q. Do you remember a statement of like nature made to you by the Sheriff, W. B. Snider, after you had attached your name to the document which Mr. Gibbs wrote up for you?

"A. Yes, he told me that evening that he would do all he could for me.

"Q. Did he make a statement of that nature to you more than once?

"A. I think he did, when I was first arrested and they had me in that private office.

"Q. What did he say to you?

"A. He said he knew I was into it for the Frenchman said I was and it would be better for me to own up to it.

"Q. Did he ever, at any time, say anything about doing what he could to assist you if you told the truth— do what he could for you or anything of that kind?

"A. Yes, that is what he said when we were in the private office before I told him."

Pressed on cross-examination the defendant answered as follows:

"Now going back to the time you were in this private office: Just what was the words Snider used to you in there?

"A. He said the Frenchman had told that I was into it and for me to own up to it and he would do what he could for me.

"Q. Are those the words he used?

"A. I think so.

"Q. Aren't these the words he used? 'The Frenchman has confessed and implicated you in this matter?'

"A. That is what he said for part of it.

"Q. Isn't that about all he said outside of the warning he gave you?

"A. He said he had implicated me in it and he wanted to know whether I was in it.

"Q. That is the words he used is it?

"A. I think so.

"Q. You think those are exactly the words he used?

"A. They might not be exactly.

"Q. He did tell you he wanted to ask you some questions about it?

"A. I don't think so.

"Q. Now you are satisfied that is what he told you, those are the words he used?

"A. That is what he meant.

"Q. How do you get the meaning out of that that he knows you are in it and it would be better for you to own up?

"A. Because the Frenchman told him is all I know.

"Q. He didn't use those words, you simply got the idea from the fact that the Frenchman had told him all about it and he wanted to ask you about it?

"A. I can't remember just the words he used.

"Q. Then you don't know, as a matter of fact whether he thought it would be better for you to own up?

"A. That is what he meant. I can't remember the words he used to say it just like he did."

This is plainly the boy's way of saying that he had given the substance of the sheriff's language as near

83 Or.—30

as he could remember the words. His inaptness of expression is amply explained by his mental status concerning which the deputy sheriff responded to cross-interrogatories as here set down:

"Q. You think then, that he is a bright fellow?

"A. No, I didn't say that.

"Q. Then answer my question as to his being bright.

"A. I would not say he is a bright man, I don't think he is.

"Q. He didn't act the part of a bright man while he was in there?

"A. He isn't—yes, well, you would not call him bright but he is not simple. No, no, he is not a bright man."

The district attorney stated as a witness that the examination of the defendant resulting in the alleged confession took place in the sheriff's private office and that at his request the sheriff locked the door to keep the people from coming in and out. He also testified in answer to the following interrogatories thus:

"Q. Did you advise Tommy that he had better secure counsel before he talked to you or the sheriff?

"A. No, I did not. I didn't tell him he had better see counsel before he talked to us.

"Q. As a matter of fact it is the policy of your office to secure the first conversation with a man when he is arrested, before they can secure counsel, isn't it?

"A. Yes, it is the policy of my office in the examination of any criminal to find out what I can about the case.

"Q. And insist upon seeing them before they can see counsel?

"A. I do if I can."

By the testimony of the state these elements proper to be considered as affecting the question about whether the confession was voluntary are thoroughly established: 1. The defendant was under arrest and in the

presence of the sheriff and the district attorney who were actively engaged in an effort to obtain from him a confession; 2. The sheriff confronted him with the announcement that the Frenchman had confessed and implicated the defendant in the commission of the crime; 3. While with the deputy during the noon hour after all this preceding talk, the latter said to him, "You had just as well tell me"; and further accused him directly of being present at the killing of the woman.

The Code has established the procedure to be followed in case of arrest:

Section 1746, L. O. L. "If the crime charged in the warrant be a felony, the officer making the arrest must take the defendant before the magistrate who issued the warrant, or some other magistrate in the same county, as provided in Section 1740."

Section 1752. "The defendant must, in all cases, be taken before the magistrate without delay."

Section 1772. "When the defendant is brought before a magistrate upon an arrest, either with or without warrant, on a charge of having committed a crime, the magistrate must immediately inform him of the charge against him, and of his right to the aid of counsel, before any further proceedings are had."

These sections mark out the plain duty of the sheriff. It was a violation thereof to take the defendant before a self-constituted board of inquisitors for their private interrogation. The law contemplates that the examination of the defendant takes place in open court and that it be not delayed by any secret proceeding. This circumstance itself of course would not alone justify the rejection of the so-called confession, but it is proper to take it into consideration with all the other conditions attendant upon the production of that document as illustrative of the atmosphere surrounding the

case. · Succinctly stated, the defendant imputes to the
sheriff the language that it would be better for the
former to own up to the commission of the homicide.
The sheriff refuses to deny this directly, but says he
may have said it; that he would not be positive that
he did; and further, that he could not be sure whether
he did or not; that he may have. This referred to the
interview during the forenoon before the officer went
to lunch. There is nothing in the testimony tending
to show in the least that the influence of this statement
of the sheriff was removed before the confession was
made to the deputy and to the district attorney as em-
bodied in the writing. The whole thing was one trans-
action beginning in the morning when the defendant
first arrived at the sheriff's office and ending in the
afternoon about 3 o'clock when the writing was
finished. The deputy sheriff was more guarded in his
utterances in the main, but avowed that he told the
defendant he had just as well tell it. Conceding that
the latter officer personally kept within the letter of the
law when he merely urged defendant that he had bet-
ter tell the truth, yet the case comes within the doctrine
announced in *State* v. *Wintzingerode,* 9 Or. 153, set out
in the syllabus thus:

"Section 169 (L. O. L., § 1537) of the criminal code
has not altered the rule of the common law as to the
inadmissibility of confessions induced by the influence
of hope, applied to the prisoner's mind by an officer of
the law having him in custody on a charge of crime.
When a confession has been improperly obtained by
such officer of a prisoner in his charge, by such means,
a subsequent confession of similar facts, made by the
prisoner while still in custody, upon the same charge,
should be excluded, unless facts or circumstances are
shown which fairly justify the inference that the in-
fluence under which the original confession was ob-

tained has ceased to operate upon the prisoner's mind."

The language addressed to the prisoner in that case by the officer having him in custody, was this: "It would be better for you, Harry, to tell the whole thing." The confession in response to that injunction was excluded by the trial court, but another made the first or second day after the arrest while the defendant was still a prisoner was admitted. This court, however, rejected even the second confession, because although there was a lapse of one or two days between the two there was nothing to show that the influence of the former inducement had been removed from the prisoner's mind. As between the defendant and the sheriff in the instant case we have the former positively affirming that the latter told him it would be better for him to own up, and the direct refusal of the officer to deny that he thus persuaded his prisoner. Under such a state of the evidence on the point the only reasonable conclusion to be drawn is that the sheriff used the language imputed to him by the defendant. Following the Wintzingerode Case as the settled law in this state, as that case has never been doubted since it was decided, the conclusion is plain that the confession ought to have been rejected. This deduction is strengthened by the circumstances of the case. The defendant's right to be taken at once before the magistrate and there by him informed of his right to counsel before any further proceedings were taken had been grossly violated. A half-witted boy was taken into a private room for an extended quiz by those whose manifest purpose was to obtain a confession and with whose brighter minds his was no match.

In *Bram* v. *United States,* 168 U. S. 532 (42 L. Ed. 568, 18 Sup. Ct. Rep. 183), the defendant was the first

mate on a ship and was charged with having killed the captain, the captain's wife and the second mate during the voyage at sea. He was brought under arrest before a police detective who after having testified that nothing was said by way of inducement to get an admission from the defendant proceeded as follows:

"When Mr. Bram came into my office, I said to him: 'Bram, we are trying to unravel this horrible mystery.' I said, 'Your position is rather an awkward one. I have had Brown in this office and he made a statement that he saw you do the murder.' He said, 'He could not have seen me; where was he?' I said, 'He stated he was at the wheel.' 'Well,' he said, 'He could not see me from there.' I said, 'Now, now look here, Bram, I am satisfied that you killed the captain from all that I have heard from Mr. Brown. But,' I said, 'some of us here think you could not have done all that crime alone. If you had an accomplice, you should say so, and not have the blame of this horrible crime on your own shoulders.' He said, 'Well, I think, and many others on board the ship think, that Brown is the murderer; but I don't know anything about it.' He was rather short in his replies."

In an opinion by the present Chief Justice of the Supreme Court of the United States, the following extract from 3 Russell on Crimes (6 ed.), 478, is quoted with approval:

"But a confession, in order to be admissible, must be free and voluntary; that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence. A confession can never be received in evidence where the prisoner has been influenced by any threat or promise; for the law cannot measure the force of the influence used, or decide upon its effect upon the mind of the prisoner, and therefore excludes the declaration if any degree of influence has been exerted."

The subject is exhaustively considered by the opinion in the Bram Case. It is there held that for an officer in charge of a prisoner to accuse him of the crime is to exercise a species of compulsion upon him in that the prisoner, perturbed as he naturally would be by being under arrest for a horrible offense, would feel compelled to make some answer to such an accusation under fear that his silence might be taken against him. Our Code in Section 727, L. O. L., says that evidence may be given on the trial of a "declaration or act of another in the presence and within the observation of a party and his conduct in relation thereto." This serves to accentuate the situation in which the defendant was when the deputy sheriff directly accused him of being present at the commission of the crime. The boy no doubt felt impelled by the very force of the accusation to make some statement and Mr. Chief Justice WHITE points out that this is an unwarrantable coercion rendering the statement involuntary within the meaning of the law. He quotes with approval the language of Mr. Justice BROWN in *Brown* v. *Walker*, 161 U. S. 591, 596 (40 L. Ed. 819, 16 Sup. Ct. Rep. 644, 646):

"While the admissions or confessions of the prisoner, when voluntarily and freely made, have always ranked high in the scale of incriminating evidence, if an accused person be asked to explain his apparent connection with a crime under investigation, the ease with which the questions put to him may assume an inquisitorial character, the temptation to press the witness unduly, to browbeat him if he be timid or reluctant, to push him into a corner, and to entrap him into fatal contradictions, which is so painfully evident in many of the earlier state trials, notably in those of Sir Nicholas Throckmorton and Udal, the Puritan minister, made the system so odious as to give rise to a demand for its total abolition. The change in the English

criminal procedure in that particular seems to be founded upon no statute and no judicial opinion, but upon a general and silent acquiescence of the courts in a popular demand. But, however adopted, it has become firmly embedded in English, as well as in American jurisprudence. So deeply did the iniquities of the ancient system impress themselves upon the minds of the American colonists that the States, with one accord, made a denial of the right to question an accused person a part of their fundamental law, so that a maxim, which in England was a mere rule of evidence, became clothed in this country with the impregnability of a constitutional enactment."

This doctrine has been embodied in Article I, Section 12, of our own state Constitution:

"No person shall be put in jeopardy twice for the same offense nor be compelled in any criminal prosecution to testify against himself."

The decision of the Bram Case was founded upon the like provision in the national Constitution.

Reverting to the doctrine laid down in the excerpt from Russell on Crimes, the question is not what amount of compulsion or inducement there may have been, but was there any of it. It matters not that the officers told the defendant he was not obliged to talk. They did tell him following up their accusation that he had just as well tell them, and by an overwhelming weight of the testimony they did say to him that it would be better for him to confess. The court will not open an account, charge the defendant with the statement of the officers who told him he need not say anything unless he wished to and credit him with his own testimony and the admission of the officers that they told him it was better to, or that he had just as well tell it after they had accused him, and after all, strike a balance in favor of the state and so admit the con-

fession. It is incumbent upon the prosecution to show that the statement relied upon was free and voluntary, and if it should appear that any inducement or compulsion in any appreciable degree enters as an ingredient into the transaction it vitiates the whole, and its admission in evidence is an abuse of the defendant's constitutional rights for which a conviction should be reversed.

Recalling that the deputy sheriff expressly says that after having accused the defendant of being present at the homicide he said to him "you had just as well tell me," a very instructive case on that branch of the subject is *State* v. *Nagle,* 25 R. I. 105 (54 Atl. 1063, 105 Am. St. Rep. 864). The defendant was accused of having murdered her husband with a pistol which she had purchased. The officer who arrested her talked with her on the way to jail. He stated as a preliminary that he had made no inducement to her and actually held out none. He declared that he told the defendant that the truth whatever that might be ought to be told, but that she had an undoubted right to plead guilty or not guilty in regard to any part of the case which was coming before the court. On cross-examination he testified that he said to the defendant:

"It is thought that you bought this revolver; but she said, 'No, sir, I did not buy it.' I said to her, 'There is no question but what you bought the revolver, and if you did you will gain nothing by denying it.' Also 'It would be better for you to tell the truth; we have ample proof that you purchased this revolver.' That she said: 'I did not, and I never was in Halliday's store in my life.' I remarked that I did not mention Halliday's store in the matter at all. 'Now,' I said, 'having mentioned the place where you bought it, you might just as well say whether or not you bought it. What did you pay them for that revolver? She said, 'I paid

them two dollars for it, and they gave me the cartridges.' ''

After referring to the Bram Case and others approving the doctrine of Russell on Crimes already noted, the court says:

''The language used by the officer, taken as a whole and taken in connection with the contradictory statements made by the defendant about the purchase of the pistol, was such as to very naturally convey to the mind of the defendant the idea that she would gain some advantage by admitting that she bought the pistol and obtained the cartridges therefor. And hence it cannot be said that her admission relating thereto was voluntary.''

The court there holds that a mere request or advice to tell the truth will not render a confession inadmissible, and says:

''But where the request or admonition is given in such language and under such circumstances that the prisoner might naturally have understood it as recommending a confession, the confession induced thereby will be inadmissible in evidence.''

In *State* v. *Alexander,* 109 La. 558 (33 South. 600), the defendant was in the custody of the arresting officers upon a charge of robbery committed in connection with one Payne. While thus detained, Alexander asked one of the officers, if Payne was yet apprehended to which question the officer replied:

''No, that as soon as he is caught, he is going to turn state's evidence, and, if you have got anything to say, you had better say it now.''

In a well-considered opinion by Mr. Justice MONROE, the court reversed the judgment of conviction because of the admission of the confession made by the defendant in response to that statement of the policeman. In

*West* v. *United States,* 20 App. Cas. D. C. 347, the syllabus says:

"The statement by a police officer to a prisoner that 'You have been telling me a pack of lies; now you had better tell the truth' is sufficient to render a consequent confession by the prisoner involuntary as a matter of law."

In *State* v. *Davis,* 125 N. C. 612 (34 S. E. 198), the defendant was arrested by an officer who said to him that he "had worked up the case, and he had as well tell all about it." The court commenting upon this language and holding that it was error to receive the ensuing confession of the prisoner, said:

"An officer, with authority to arrest, discharges his duty by simply making the arrest, and it is no part of his duties to provoke a prisoner to make any statement. The genius of our free institutions provides that admissions of a party should not be used against him, unless made voluntarily. The common law looks with jealousy on such confessions; for, if made under the influence of hope or fear, they furnish no test of the truth of the matter. They may be true, and they may be inspired by either hope or fear that such statements will be better for him in the near future."

In *State* v. *Whitfield,* 70 N. C. 356, the language of the prosecutor was this:

"I believe you are guilty; if you are you had better say so; if you are not, you had better say that."

It was held that the confession was made under the influence of hope or fear or both and was inadmissible. In *People* v. *Gonzales,* 136 Cal. 666 (69 Pac. 487), as stated by the opinion it appears that the sheriff visited the defendant in prison; that at first the latter denied all knowledge of the crime, but after awhile the sheriff "told him he had better come out and tell the truth; that the statement he had formerly made was not true;

that it would be better for him to tell the truth; that he (the sheriff) believed that he was implicated in the crime,—had evidence tending to implicate him in it,—and did not believe his denial.'' The court there says:

"It scarcely needs reasoning to show that a statement extorted as was this one is not the free, voluntary statement which the law contemplates shall alone be admissible."

A substantially parallel case is *State* v. *Jay,* 116 Iowa, 264 (89 N. W. 1070). The deputy sheriff who arrested the defendant on a charge of larceny of a mare, testified thus:

"Q. You told him if he would tell where she was it would go easier with him, did you?

"A. I might have told him it would be better for him. The mare he had taken had been traded, and he wanted to tell where she was. After I asked him some statements, he said he would tell where the mare was.

"Q. That is, you asked him questions, as the testimony here shows, of Mr. Garner, that if he would tell this it would be easier for him?

"A. Perhaps I told him something like that; yes.

"Q. Didn't you, Mr. Keenhold, in fact, tell him that before Garner came up?

"A. Yes, sir; perhaps I did.

"Q. And, when you told him it would go easier for him if he would tell about it, then he told you before Garner came up about the horse?

"A. He told me; yes. He told me where he had traded the horse, and where he could probably find her."

The language of the court follows:

"It is elementary law that such statements must be entirely free and voluntary; that is, must not be extracted by any sort of threats or violence, nor any direct or implied promises however slight, in order to be admissible. It is not important to determine whether they amounted to a confession of guilt, or merely a dec-

laration of facts tending to show guilt, for, as said in Greenleaf on Evidence, 'the law excludes not only direct confessions, but any other declaration tending to implicate a prisoner in the crime charged, even though in terms it is an accusation of another or a refusal to confess.' The evidence leaves no doubt but that the officer, before anything was said by Jay, assured him that it would go easier with him if he would tell where the mare, alleged to have been stolen, was, and we have only to determine whether this was sufficient inducement to justify the exclusion of the evidence.''

In *Vaughan* v. *Commonwealth,* 17 Gratt. (58 Va.) 576, the court refused to distinguish between the statement ''you had as well tell all about it'' and one to the effect that the defendant had better tell about it, and rejected the confession. These cases are applicable to the situation as portrayed by the testimony of the officers themselves to the effect that they confronted the prisoner with the statement that the other man had implicated him; that he had just as well tell about it, and directly accused him of being present at the homicide: There can be no question whatever that these statements were made because they come from the mouths of the witnesses for the prosecution. Why was the defendant taken into the sheriff's private office under lock and key and catechised by the officers? It was for the purpose of getting a confession. Why was he told that he had just as well tell it? It was to urge him to make a statement. Why was he directly accused of being present at the crime? It was a species of compulsion to move him to speak. Under all these circumstances the authorities quoted are demonstrative that the statement is not voluntary and ought to be rejected and this independent of the defendant's testimony not denied by the sheriff that he was told it would be better for him to own up. On the statement of the officers

themselves the court plainly drew the wrong conclusion from the admitted facts and abused its legal discretion in allowing the statement to go to the jury.

But it is said the officers warned him that he need not make a statement unless he was willing and immediately prior to beginning the writing again told him that he need not make a statement unless he wished to. None the less, however, not a single one of them anywhere says that they withdrew the former statement that he had just as well tell it or their accusation against him of the crime and that the other man had implicated him. There is nothing whatever to show that this influence had been removed. As well might a robber say "I told my victim that he need not give up his purse, yet I had my loaded pistol pointed at his head." The officers may have observed the letter of the law in their formal admonition but they broke it in the spirit by their other language as shown by the precedents quoted. The whole transaction was covered by the time between about 9:30 o'clock in the forenoon and soon after 1 o'clock in the afternoon when the taking of the written confession began. In *Commonwealth* v. *Taylor,* 59 Mass. (5 Cush.) 605, the language of the opinion is this:

"In the present case, the promises were such, as might excite hopes in the mind of the prisoner, that he should be materially benefited by making disclosures. He was in the hands of the police officer Starkweather, and Wright, a deputy sheriff, and he was told by them that if he should make disclosures that would be of benefit to the government, they would use their influence to have them go in his favor. This was between four and five o'clock in the afternoon. He did not then make any disclosures; but the next morning, being in the custody of Wright, and without any further inducements, he made the admissions now offered to be proved. The case seems to us to fall within the rule,

excluding confessions obtained under the influence of inducements held out by an officer having the prisoner in his custody, and for that reason the testimony of Wright ought to have been excluded."

In *Commonwealth* v. *Curtis,* 97 Mass. 574, the officer having the defendant in custody said to him that "as a general thing it was better for a man who was guilty to plead guilty, for he got a lighter sentence." Commenting on this the court said:

"It is true that this remark was in reply to an inquiry by the prisoner whether he should advise him to plead guilty, and that the officer promised by saying that 'he did not wish to advise him one way or the other for fear it might not suit him.' But we do not think any different rule is to be applied because the prisoner introduced the conversation on the subject, and solicited the counsel of the officer. The officer ought not to have assumed to act as his adviser even at the prisoner's request. * * There is no doubt that any inducement of temporal fear or favor coming from one in authority which preceded and may have influenced a confession, will cause it to be rejected unless the confession is made under such circumstances as show that the influence of the inducement has passed away. No cases require more careful scrutiny than those of disclosures made by a party under arrest to the officer who has him in custody, and in none will slighter threats or promises of favor exclude the subsequent confessions."

In *Mackmasters* v. *State,* 82 Miss. 459 (34 South. 156), the defendant had made a confession to the officer which the court ruled was inadmissible because of inducements held out to the defendant; but admitted subsequent statements to another person. The opinion there says:

"If the confession made to Harvey is not free and voluntary, then the subsequent statements to Lambert are tainted with the same inducements, and are to be

attributed to the first cause moving the defendant to make the confession to Harvey, unless the evidence clearly shows otherwise. Under the decisions of this court it is clear that the confessions were not free and voluntary, and the objections made to their introduction in evidence should have been sustained.''

In *Banks* v. *State,* 93 Miss. 700 (47 South. 437), the prisoner's first confession was rejected because of improper inducements. The judgment of conviction was reversed because the second confession made the next day to the same parties while still in their custody was admitted. In *People* v. *Silvers,* 6 Cal. App. 69 (92 Pac. 506), the defendant under arrest for the crime of larceny was brought before the district attorney. There were also present one Aitken, one of the officers of the defendant's employing corporation, together with the president of the institution, a Pinkerton detective and the defendant's brother. The district attorney informed him (the accused) that he understood he desired to make a confession; whereupon the defendant said nothing but tears came into his eyes and then Aitken said to him: ''Brace up old man and it will be better for you, and tell everything you know.'' He still hesitated but afterwards made a statement indicative of guilt. It was held that Aitken's statement urging the defendant to confess being made in the presence of the district attorney and not contradicted may well have been construed as a promise of favor if he confessed, though the district attorney informed defendant that he need tell only what he desired. The court said that under such circumstances it was incumbent upon the district attorney not only to say to the defendant that he need not speak unless he wished to, but also to go further and explicitly remove the statement of Aitken from the case and to disclaim being bound by it. In *People* v. *Castro,* 125 Cal. 521 (58 Pac.

133), the defendant had made confessions to the sheriff under influences which the court held to be vitiating, and on appeal the case was reversed because confessions made several days after the first, although not by further inducements were admitted in evidence. These authorities clearly dispose of the contention that the written confession is admissible in the instant case because immediately before beginning the writing the prosecuting officer again told the defendant he need not speak unless he wished to. The showing on that point is much stronger in favor of the defendant than the precedents cited, because here it is substantially one transaction covering only a few hours. The defendant had but little time to reflect. He was oppressed by the calamity of his situation. He was so perturbed that as one of the officers testifies he said he did not want anything to eat, and this although he had ridden in the cold of a winter morning to the county seat in Lake County. A long list of authorities on the subject both English and American is set down in *Bram* v. *United States,* 168 U. S. 532 (42 L. Ed. 568, 18 Sup. Ct. Rep. 183).

In brief, on the subject of confessions as taken from the evidence of the officers themselves the fact that the defendant is under arrest and is told that another party has confessed implicating him and that he is accused of being present at the homicide and that he had just as well tell it, constitute a compulsion which excludes any confession made in pursuance thereof, although the officers went through the formality of saying to him that he need not speak unless he wished to. Furthermore, the fact that the defendant declares that the sheriff told him it would be better for him to own up and that the sheriff taxed with this statement on cross-examination would not deny it, and neither did the

deputy, establishes by a strong preponderance of the evidence that such language was used by the officers, and the authorities are practically unanimous that this constitutes an inducement avoiding the confession. The admissions of the officers clearly show compulsion within the doctrine of *Bram* v. *United States,* 168 U. S. 532 (42 L. Ed. 568, 18 Sup. Ct. Rep. 183), and authorities there cited. The court admitted the confession in the face of undisputed facts disclosing coercion influencing the statement of the defendant. The judge was wrong as a matter of law in his conclusion from the facts thus established.

The contention of the state was in substance that the two defendants went to the abode of the deceased and choked her to death for the purpose of stealing her money which she kept in her trunk there. The physician who examined the body was called, and as a witness described the conditions present, the finger marks upon the throat and internal hemorrhage, and then testified as follows over the objection of the defendant:

"Q. From the position of the marks upon the woman's throat and the condition of the throat, can you state, as a result of your examination as a physician, whether or not the strangulation was self inflicted?

"A. It was not.

"Q. From such examination can you state whether or not it was the result of an accident?

"A. My opinion was it was not accidental."

It was the exclusive province of the jury to determine whether the violence was inflicted accidentally or feloniously. This testimony admitted by the court over the defendant's objection allowed the witness to determine that question for the time being by his opinion. Moreover, it was not a question for opinion or expert evidence. The witness, whether professional

or layman is limited in such cases to a description of the things which he saw and the jury was quite as competent as ordinary observers to determine whether the violence was self inflicted or not.

In *State* v. *Barrett*, 33 Or. 194 (54 Pac. 807), a conviction of manslaughter was reversed for the single error of receiving opinion evidence upon a matter which the jury was competent to determine without the assistance of experts. It is there said in the syllabus:

"The opinion of a witness that the body of the deceased at the time he saw it did not lie in the position in which it fell when the person was shot is not competent evidence, for it appeared that the position of the body and the surroundings of the place could all be accurately described, and under such circumstances the jury are to draw their own conclusions."

In *State* v. *Mims,* 36 Or. 315 (61 Pac. 888), the defendant pleaded self defense and undertook to show that he was as helpless as a child in a fight with the deceased and did not stand any chance to get away from him. The court held that this called for a matter of opinion of the witness concerning a matter on which the jury were quite as competent to decide as the witness. In *State* v. *Jennings,* 48 Or. 483 (87 Pac. 524, 89 Pac. 421), the error leading to the reversal of the conviction of murder was admitting the opinion of a witness about the direction from which a shot was fired; and the court held that where the facts observed by a witness can be accurately portrayed to a jury, the evidence should be limited to such recital and the witness should not be permitted to state his deductions from such facts.

"For instance," says the syllabus, "a witness who saw the surroundings soon after a homicide by shooting should not be allowed to state his opinion as to the place

from which the bullet came, where the conditions observed can be adequately described."

See, also, *Everart* v. *Fischer,* 75 Or. 328 (145 Pac. 33, 147 Pac. 189). These cases are certainly controlling against the opinion of the witness concerning whether or not the death was the result of accident. It was for the jury alone to determine whether the death was accidental or felonious and the witness might as well have been asked his opinion about the guilt or innocence of the defendant. Besides being outside the range of expert testimony the declaration of the witness invaded the province of the jury.

Exception was taken to the giving of instruction No. 12½ to the effect that voluntary intoxication is not a defense to a prosecution for crime. The charge in that respect was correctly framed in the abstract, but a careful perusal of the full report of the testimony attached to and made part of the bill of exceptions reveals nothing whatever showing that the defendant was intoxicated or that drunkenness was urged as a defense. It is true that in the confession the defendant spoke of drinking with his codefendant from a bottle of whisky, but he does not pretend to have been drunk and all the witnesses who spoke on that subject said that at the time of the homicide he was not intoxicated.

He also assigns error upon the giving of instruction No. 16, which is here set down:

"The constitution of this state having been amended to abolish capital punishment, the crime of murder is limited to murder in the second degree and manslaughter. You are therefore instructed that under this indictment, you may find the defendant not guilty, or you may find him guilty of manslaughter, or you may find him guilty of murder in the second degree."

The reference to the constitution and murder in the first degree is pure abstract gratuity, having no place in a charge to the jury on the crime mentioned in the indictment. It amounts to a tacit intimation to the jury from the bench that in the opinion of the judge the defendant ought to be hanged, but as capital punishment has been abolished they should punish the defendant as severely as possible.

The court gave instructions 17, 18, and 19, as follows:

No. 17. "Murder in the second degree is where a person, purposely and maliciously, but without deliberation or premeditation, or in the commission or attempt to commit any other felony than rape, arson, robbery or burglary, kills another, or where a person, by an act imminently dangerous to others, evincing a depraved mind regardless of life, although without the design to effect the death of any particular person, kills another."

No. 18. "Manslaughter is where a person, without malice expressed or implied, or without deliberation, upon sudden heat of passion caused by strong provocation, kills another; or where a person in the commission of an unlawful act, or in the commission of a lawful act, without due caution or circumspection, involuntarily kills another."

No. 19. "Under this indictment it is not necessary to prove expressly either a purpose to kill, or deliberate and premeditated malice. The indictment having alleged murder while engaged in the commission of larceny in a dwelling house, it is only required that the larceny and the killing, in the manner alleged during the larceny be proven to make out the case. In such a case and under such proof the intent to kill and the deliberate and premeditated malice are incontrovertibly implied."

The defendant predicates error upon the giving of instruction No. 19. The court had already stated to the jury in No. 17 that murder in the second degree is

where a person purposely and maliciously kills another, but without premeditation or deliberation, while in No. 19, he says that:

"In such a case and under such proof the intent to kill and the deliberate and premeditated malice are incontrovertibly implied."

These two instructions contradict each other for in the first deliberate and premeditated malice is excluded while in the latter it is held to be "incontrovertibly implied." Again, in No. 18, the court said that a person is guilty of manslaughter, if he kill another without malice or without deliberation, but took away from the jury in No. 19 all doubt of deliberate and premeditated malice being an element of the offense by saying it was incontrovertibly implied. Moreover, in No. 18 the judge told them that manslaughter consisted in involuntary homicide happening in the commission of an unlawful act, yet in No. 19 he told them that the indictment having alleged murder while engaged in the commission of larceny in a dwelling-house, only requires that the larceny and the killing, in the manner alleged during the larceny be proven to make out the case.

As applied to this issue it cannot be true that both these instructions, 18 and 19, correctly declare the law. If it is manslaughter only to commit a homicide while in the perpetration of an unlawful act as described in No. 18, it certainly cannot be murder in the second degree to kill another while in the perpetration of an unlawful act as described in 19. Again, the court had no right to inject into the case deliberate and premeditated malice in any event because that is not included in any definition of murder in the second degree.

There is no testimony in the case indicating that any accomplice testified, yet the court gave the jury an in-

struction to the effect that a conviction could not be had upon the testimony of an accomplice. This was another abstraction not justified by anything in the record. As said in *State* v. *Miller,* 43 Or. 325, 333 (74 Pac. 658):

"The instructions are not only wholly disconnected in context, but are in direct conflict, so that they cannot be read together, as a harmonious and correct statement of the principle of law involved: *People* v. *Gonzales,* 71 Cal. 569 (12 Pac. 783); *Perkins* v. *State,* 78 Wis. 551 (47 N. W. 827); *State* v. *Keasling,* 74 Iowa, 528 (38 N. W. 397.)"

The charge to the jury abounds in abstractions and contradictions. This court has many times held that abstract instructions although correct in a proper case, are cause for reversal when not fitted to the issue in hand: *Willis* v. *Oregon R. & N. Co.,* 11 Or. 257 (4 Pac. 121); *Breon* v. *Henkle,* 14 Or. 494 (13 Pac. 289); *Marx* v. *Schwartz,* 14 Or. 177 (12 Pac. 253); *Bowen* v. *Clark,* 22 Or. 566 (30 Pac. 430, 29 Am. St. Rep. 625); *Booth* v. *Scriber,* 48 Or. 561 (87 Pac. 887, 90 Pac. 1002); *Woodward* v. *Oregon R. & N. Co.,* 18 Or. 289 (22 Pac. 1076); *Buchtel* v. *Evans,* 21 Or. 309 (28 Pac. 67); *Coos Bay R. Co.* v. *Siglin,* 26 Or. 387 (38 Pac. 192). The subject is treated by Mr. Justice MOORE in *Tonseth* v. *Portland Ry., L. & P. Co.,* 70 Or. 341 (141 Pac. 868), a decision written since the procedure laid down in Article VII, Section 3, of the Constitution. Many of our own decisions are there collated and the doctrine reiterated that the giving of abstract instructions are *per se* ground for reversal. Finally, on this point, in the case of *State* v. *Branson,* 82 Or. 371 (161 Pac. 689), Mr. Justice BENSON reviewed the proceedings of the Circuit Court and found them faultless with the exception that the Circuit Court had given an instruction upon

conspiracy which the opinion denominates "undoubt-edly a correct and excellent abstract exposition of law" but reversed the case for the sole reason that there was no testimony to which the instruction was applicable. For instance, in the case at bar the instruction that "deliberate and premeditated malice are incontro-vertibly implied" is not only an abstraction, for de-liberation and premeditation are not elements of any definition of murder in the second degree under our statute, but also it is not an accurate statement of the law.

The objection to the indictment is without merit and there is nothing to justify criticism of the in-struction about a dwelling-house. If a building is habitually used as a place of abode of any human being it is a dwelling-house within the meaning of the law without reference to the moral conduct of its inmates. In charging the jury the court should have confined its attention to the form of homicide set out in the indictment or at the most to a lesser degree necessarily included therein. Reference to the abolition of murder in the first degree and putting into the case the elements of deliberation and premeditation which by our statute are excluded from all forms of murder in the second degree were clearly erroneous.

Aside from the manifest error of admitting the con-fession and permitting the opinion of the witness to invade the province of the jury the case is clearly obnoxious to the opinion laid down in the Branson Case and if the defendant there was entitled to a reversal for the single error noted by Mr. Justice BENSON, the same ruling is due to the defendant here for the mani-fold errors appearing in the instructions alone. The conviction should be reversed and a new trial ordered.

MR. JUSTICE BENSON specially concurring:

The only ground upon which the judgment of conviction in this case can be upheld is to base the affirmance upon the power given to us in Article VII, Section 3, of the Constitution of the State of Oregon. This I regard as a power to be used sparingly and with great caution. Its application to the case at bar would, I fear, tend to such carelessness and relaxation of the safeguards which the constitution itself throws around the trial of a criminal case as to be of doubtful advisability, and I therefore concur in the conclusion reached by Mr. Justice BURNETT.